Michael COMRIE, Ian Cheong, Earle Comrie, Kay Comrie, Leroy Dougherty, Cynthia A. Ott, Peter Ott, Stephanie Sebastiano, Sally Seto, Afshin Shams, and Julie M. Shams, Plaintiffs,

v.

ENTERASYS NETWORKS, INC., a Delaware corporation, GNTS (Canada) Inc., an Ontario corporation, and Global*Network* Technology Services, Inc., a Delaware corporation, Defendants.

C.A. No. 19254.

Court of Chancery of Delaware, New Castle County.

Submitted: Aug. 18, 2003.
Decided: Sept. 4, 2003.

Vernon R. Proctor, Christal Lint, The Bayard Firm, Wilmington, Delaware, for the Plaintiffs.

William M. Lafferty, Patricia Uhlenbrock, Morris, Nichols, Arsht & Tunnell, Wilmington, Delaware; Douglas H. Meal, Emily C. Shanahan, Ropes & Gray, Boston, Massachusetts, for the Defendants.

## OPINION

LAMB, Vice Chancellor.

### I.

Near the height of the recent Internet/IPO market bubble, the plaintiffs sold their business in exchange for a combination of cash and options to purchase stock in a corporation that the defendants planned to take public through an IPO at a price significantly greater than the strike price of those options. The implied "in the money" value of those options (measured against the anticipated IPO price) clearly represented a portion of the purchase price for the sale. To protect the plaintiffs, in the event the defendants decided not to go forward with an IPO involving that corporation, the parties agreed that the defendants would either issue "equivalent" replacement awards to the plaintiffs, or pay $4.62 million in cash. One year later, the defendants determined not to proceed with the IPO and, instead, issued to the plaintiffs replacement options having a significantly negative "in the money" value.

The court held a two-day trial and, following post-trial briefing and argument, now concludes that the defendants breached their performance obligation under this

true alternative contract by failing to make an equivalent replacement award. This conclusion is based on a reading of the contract to require that a replacement award be structured to recreate the potential "in the money" value of the initial options at the time they were issued (measured against the anticipated IPO price), rather than the "in the money" value of those options at the time the determination was made to abandon the IPO. Damages will be awarded based on this conclusion and certain secondary assumptions further discussed in this opinion.

## II.

### A. Background

BIT Management, Inc. ("BIT"), an Ontario corporation, was a small but growing technology business engaged in the information technology consulting and software development industry. BIT was founded by plaintiffs Michael Comrie, Ian Cheong, Leroy Dougherty, Peter Ott and Afshin Shams (collectively the "BIT Partners") in early 1998. Comrie served as BIT's Chief Financial Officer from February 1998 until its acquisition by Cabletron Systems, Inc. in August 2000. The BIT Partners, and members of their immediate families—the remaining plaintiffs in this action [1]—owned all of the issued and outstanding BIT stock.

In early 2000, Cabletron Systems, Inc.,[2] a Delaware corporation based in Rochester, New Hampshire, was a large publicly traded information technology firm. At that time, Cabletron engaged in a restructuring whereby it created four separate operating entities, each of which was focused on one of Cabletron's then existing lines of business. After the restructuring, Cabletron essentially became a holding company for the operating subsidiaries. Cabletron's plan was for each of these operating entities to undergo an initial public offering ("IPO"), followed by a spin-off of the subsidiaries' remaining shares to Cabletron's existing stockholders. Cabletron attempted to implement this plan because it thought these subsidiary "businesses could be more successful if separated out" from their parent company.[3] Cabletron's board of directors approved the restructuring in February 2000 and its stockholders gave their consent in June 2000. Cabletron's goal was to complete the IPOs of its operating subsidiaries within 18 months of its announced restructuring and to complete each subsidiary's spin-off within six months of its IPO.

As part of the restructuring, Cabletron created an operating subsidiary for its network consulting business sector, which became Global*Network* Technology Services, Inc. ("GNTS"). Christopher Noell was Vice President of Business Development for GNTS from early 2000 until April 2001. GNTS faced significant obstacles before becoming a viable candidate for an IPO. First, GNTS had to significantly increase revenues. Second, and probably more importantly, because its revenues were primarily derived from Cabletron affiliated entities, GNTS needed to diversify its revenue base outside the Cabletron family of companies. To accomplish this, GNTS developed an acquisition strategy

---

**1.** These plaintiffs are the spouses and (in Comrie's case) parents of the BIT Partners: Earle Comrie, Kay Comrie, Cynthia Ott, Stephanie Sebastiano, Sally Seto, and Julie Shams.

**2.** The defendants in this action are Enterasys Networks, Inc., a Delaware corporation and successor in interest to Cabletron Systems, Inc., and Global*Network* Technology Services, Inc., a Delaware corporation.

**3.** Trial Tr. at 347.

that encompassed purchasing small service companies that were complementary to its existing business.

BIT, whose customer base was mostly Fortune 500 companies, had previously worked on several projects with Cabletron and consistently received "positive feedback" on the work it performed.[4] Noell, who was the lead negotiator for acquisitions by GNTS in 2000, was told by a colleague that BIT was a leader in the field of network management, and that it could aid GNTS in expanding that practice area. GNTS also believed that the BIT Partners were a "very talented team."[5] Because of all these factors, a meeting was organized between BIT and GNTS to discuss the relative interest in a transaction between the two companies.

### B. Initial Acquisition Meetings And Preliminary Offer

Sometime in late February or early March 2000, representatives from GNTS and BIT held a meeting at Cabletron's Toronto office. The BIT Partners, Noell, and Rick Meares, GNTS's Chief Financial Officer, attended the meeting. The parties talked about a range of possible transactions between BIT and GNTS, including a possible acquisition of BIT. No specific terms regarding a transaction were mentioned at that meeting.

The next meeting among the BIT Partners and GNTS representatives occurred on April 25, 2000 at Cabletron's Rochester, New Hampshire headquarters. The BIT Partners, Noell, and then-Chief Executive Officer of GNTS, Earle Humphreys, attended the meeting. At the meeting,

Noell provided a spreadsheet describing a possible acquisition price for BIT.[6] The spreadsheet showed a "BIT Valuation" of approximately $7.2 million, based on the assumption that 80% of BIT's revenue corresponded to services that GNTS wanted to acquire. GNTS's valuation was based on a "proposed multiple" of 6 times BIT revenues GNTS was willing to acquire.

Noell discussed a section on his spreadsheet entitled "GNTS Share Valuation." This section related to the expected proceeds from an anticipated GNTS IPO, and how that value related to stock options GNTS wanted to include as part of the total consideration paid to acquire BIT. He estimated that GNTS's revenues at the time of the anticipated IPO would be $60 million and that the IPO would occur at an expected multiple of 10 times GNTS's revenues, which was the multiple at which its direct competitors were trading at the time. Noell explained that based on an expected market capitalization of $600 million and a proposed offering of 40,000,000 shares of GNTS common stock, the IPO price per share was estimated at $15.

Finally, the participants discussed the GNTS stock options that were to comprise part of the consideration for an acquisition of BIT. Noell explained that the estimated exercise or "strike" price of the options would be $3, resulting in an expected $12 "in the money" value for each option at the eventual IPO date.[7] The $12 difference between the $15 IPO price and the $3 exercise price, when multiplied by the total number of options expected to be offered

---

4. *Id.* at 7–8.

5. Noell at 14. Noell testified by videotape and references to his testimony appear as "Noell ___."

6. *See* PX 2.

7. The "in the money" or "intrinsic" value of a stock option, as used in this litigation, is the difference between the exercise price of an option and the fair market value of the underlying stock.

to the BIT Group,[8] resulted in an expected aggregate "in the money" value at IPO of $4.62 million. After subtracting the aggregate "in the money" value of the GNTS options from the estimated total BIT valuation of $7.2 million, Noell's spreadsheet indicated a "cash at close" payment to the BIT Partners of approximately $2.56 million.[9]

This stock option component was discussed at length at the April 25 meeting. Humphreys told the BIT Partners that the options offered would be valid for ten years, and would vest over a period of four years. This four-year vesting period would coincide with employment contracts offered to the key employees of BIT. Comrie initially proposed a two-year vesting schedule but Humphreys refused, insisting on the four-year vesting schedule to ensure that the BIT Partners were "very well incented" to remain at GNTS for the entire four-year period.[10]

Based on the parties' discussions at the April 25 meeting, Noell prepared a revised spreadsheet, which increased the revenues GNTS expected to acquire from BIT from approximately $1.2 million to approximately $1.5 million, to account for the fact that BIT's revenues attributable to services and custom product, the portion of BIT's business that GNTS was interested in acquiring, was actually 98%, not 80%, of BIT's total revenues.[11] That adjustment resulted in an increase in the "BIT Valuation" to approximately $8.8 million, which was again based on a multiple of 6 times the BIT revenues that GNTS wanted to acquire. The $4.62 million "in the money" value of the GNTS options at the IPO date remained the same.[12] Thus, to account for the increased valuation placed on BIT, "cash at close" increased to approximately $4.2 million. The BIT Partners did not raise any objections to this revised spreadsheet, whereupon Cabletron and GNTS began preparing a formal offer for the acquisition of BIT.

After the April 25 meeting, Comrie became BIT's designated representative for negotiations. On April 28, Comrie sent Noell a revised spreadsheet that, among other things, included actual service revenues from BIT's financial statements.[13] On May 1, Noell told Comrie that GNTS wanted to "proceed further along" and that a "formal offer" was forthcoming.[14] Also on May 1, Noell told Comrie by e-mail that the parties were "in substantial agreement about the offer" and that GNTS wanted to start its due diligence.[15] By "the offer," Noell was referring to Comrie's April 28 spreadsheet.[16] GNTS started its due diligence in May 2000.

### C. Negotiation And Drafting Of The Term Sheet

On June 14, 2000, Cabletron and GNTS presented a formal offer, in the form of a term sheet, to the BIT Partners.[17] Although the first draft of the term sheet contemplated the issuance of the same number of GNTS stock options (385,000)

---

8. The BIT Group consists of the BIT Partners and 13 other former BIT employees that were expected to continue working for GNTS after the acquisition.

9. See PX 2.

10. Comrie Dep. at 78.

11. See PX 3.

12. Id.

13. See PX 5.

14. DX 7.

15. PX 7.

16. PX 67 at 61–62.

17. See DX 12.

and the same total cash payment of $4.2 million as in the April 25 preliminary offer, there were significant differences as well. For example, Section 1 of the term sheet provided that Cabletron would "acquire all of the outstanding stock of [BIT] for cash ('the Acquisition')."[18] Similarly, Section 2 of that term sheet identified nothing other than cash as the "the purchase price for the Acquisition."[19] Section 2 diverged from the April 25 preliminary offer because Cabletron now proposed that the $4.2 million in cash, which had previously been labeled "cash at close," would be paid in three equal installments, with only the first installment to be paid at the closing. Section 2 further provided that, as a condition to receiving the subsequent cash installments, 4 out of 5 BIT Partners had to remain employed by GNTS.

Section 5 of the June 14 term sheet, entitled "Employees," addressed the options that Cabletron contemplated granting in its preliminary offer. It provided for the issuance of 385,000 GNTS options to the BIT Group. Section 5 also provided that the exercise price of the options would be set at the fair market value of GNTS stock as of the date of grant and that the options would vest over a four-year period. Finally, Section 5 stated that "in all other respects, [the GNTS options were to] be on the same terms and conditions as stock options granted to other employees of Cabletron under the stock option plan of [GNTS]."[20] After reviewing this term sheet, Comrie was concerned about, among other things, the fact that there was no reference in Section 5 to the contemplated value of $4.62 million for the options that GNTS had represented in its April 25 preliminary offer.

Over the next few days, Comrie corresponded with Noell regarding the June 14 term sheet. At the time, Comrie's primary concern related to the fact that the cash component of the deal would be paid over three years and that the second and third installments were dependent upon 4 out of 5 BIT Partners remaining employed with GNTS. To settle this issue, the parties agreed to a compromise. The BIT Partners agreed to accept both the deferred cash payments and the conditions precedent to the receipt of those payments, and Cabletron and GNTS agreed to increase the cash component of the deal from $4.2 million to $5.61 million.[21]

On June 19, Comrie forwarded to Noell a revised draft of the term sheet.[22] Section 2 of the new term sheet reflected the agreement regarding the $5.61 million cash payment and the employment-related condition precedent that had to be satisfied to receive that payment. In the June 19 draft, Comrie also added several paragraphs to Section 5, including provisions for an employee signing bonus, partner salaries, and

18. *Id.*

19. *Id.* The defendants meekly argue that this language indicates that the stock options at issue in this transaction were not part of the "purchase price" for BIT. *See* Def. Ans. Br. at 13 & n. 8. This argument misses the mark because, regardless of whether the stock options were discussed in the paragraph of the term sheet discussing the Acquisition, it is abundantly clear that all parties believed that stock options were intended to form part of the total consideration offered to the BIT Partners in exchange for acquiring all of the outstanding BIT stock. *See, e.g.,* PX 2 (considering the GNTS options offered as part of "BIT Valuation").

20. DX 12.

21. *See* Trial Tr. at 45; Noell at 58–59. Cabletron also agreed that 3 out of 5, rather than 4 out of 5, employees would have to remain employed in order for the selling stockholders to receive the second and third installments.

22. *See* DX 18.

additional options for new employees. In a new paragraph of Section 5, the BIT Partners proposed to ensure receipt of "in the money" value of at least $11.50 per option, whether or not a GNTS IPO proceeded, or if it went forward at a different price, or if GNTS was sold to a third party.[23] This was accomplished by including the following language:

In the event that the IPO is not completed, or not successful, or the company is sold prior to IPO, the value of the options will be payable in cash over the 4 year vesting period. The 4-year period is to be measured from the date of close. Each option will have an in the money value of no less than $11.50 ($15 IPO less $3.50 option). Any difference is to be paid in cash.[24]

Noell responded by sending another revised term sheet to Comrie on June 27.[25] This term sheet contained some additional and different provisions relative to the previously exchanged term sheets. First, Section 2 was changed to condition payment of the second and third cash installments upon the achievement of certain "quarterly target revenues" for the first year after closing.[26] Second, Section 5

deleted in its entirety the BIT Partners' proposed guarantee language related to the options and substituted the following:

In the event that Cabletron determines not to pursue its current intention to cause GNTS to undergo an initial public offering or determines not to pursue its current intention to cause GNTS to undergo a spin-off from Cabletron, and Cabletron does not provide substitute or replacement awards, including cash awards, to the GNTS employees, including, on the same terms and conditions, former employees of [BIT], then Cabletron will pay $4.62 million in the aggregate for all options then held by the Partners and former employees of [BIT].[27]

This new paragraph of Section 5 was unacceptable to BIT because it was not clear that the referenced "substitute or replacement awards" would necessarily have a value equivalent to the benchmark number of $4.62 million.[28] Despite this, Comrie e-mailed Noell the same day to say that, "[a]t a quick glance [the June 27 term sheet] seems a lot better [than previous versions] and more in line with our expectations. I'll be in touch tomorrow."[29] As

23. *Id.* On June 2, in an e-mail from Noell, Comrie learned that the strike price of the GNTS options had been increased from $3 to $3.50 per share, thus reducing the anticipated "in the money" value per share from $12 (*i.e.*, $15 expected IPO price minus $3 strike price) to $11.50. *See* Trial Tr. at 32–33; DX 11.

24. DX 18.

25. *See* DX 20.

26. *Id.*

27. *Id.* The June 27 draft contained other changes as well, some of which were cosmetic. GNTS agreed to the proposed partners' salaries and the concept of a signing bonus for employees. The draft also reflected an increase in the number of GNTS options to be awarded to the BIT employees from 385,000

to 418,000, due to an increase in the number of BIT employees. Finally, the June 27 draft contained a new provision stating that the GNTS options could not be exercised until GNTS had been spun off from Cabletron.

28. *See* Trial Tr. at 54–55.

29. DX 21. There are inconsistencies in Comrie's testimony regarding this e-mail. He initially testified that his response was rushed and he did not fully appreciate the entire term sheet because he was just about to leave his office to go sailing that day. *See* Trial Tr. at 55–56. This claim is significantly undercut, however, by his testimony, both at his deposition and at trial, that the new language of Section 5 of the June 27 draft "jumped off the page" at him the moment he read it. *See id.* at 160–61; Comrie Dep. at 222–23.

Comrie's June 27 e-mail proposed, he and Noell did speak on June 28. Noell does not recall that this conversation was particularly contentious or difficult. In fact, in an e-mail that he sent to his superior, Dan Harding, on June 29, Noell noted that the BIT Partners had "some minor wording changes," and that the "only significant change was that [Comrie] wanted [GNTS] to agree not to change [its] business practices/interfere in the day to day operations of BIT...."[30] Comrie had a different recollection of that conversation. According to Comrie, Noell expressed agreement that BIT "needed to have some way of making sure that if they replaced these options, that they weren't just anything; that they would have to have a value equivalent to this 4.6 benchmark...."[31]

After discussions with his colleagues, Comrie drafted another term sheet on June 29.[32] His covering e-mail described the latest changes to the term sheet as concerning "mainly the revenue targets and guarantees," because the revenue guarantees that appeared in Cabletron's June 27 draft were BIT's "primary focus" at that time.[33] In addition, Comrie introduced a deadline, December 31, 2000, by which GNTS's IPO had to occur before triggering the next to last paragraph of Section 5. Comrie further inserted the word "equivalent" to describe "substitute or replacement awards" in the substitution provision of the next to last paragraph of Section 5.[34]

On June 30, Cabletron responded to Comrie's proposed term sheet by sending another draft term sheet, which changed the IPO deadline to December 31, 2001 and removed the word "equivalent" from the next to last paragraph of Section 5.[35] In an e-mail dated July 4, Comrie explained to Noell that the word "equivalent" needed to be put back into the penultimate paragraph of Section 5 because without that word the replacement awards "could be any amount."[36] Noell responded on July 5 that he did "not see any problem with ... adding back the word 'equivalent' or some substitute that conveys the concept."[37]

Cabletron's final draft of the term sheet, produced on July 5, added back the word "equivalent" to the substitution provision of Section 5 and made certain other minor changes that Comrie had requested.[38] The BIT Partners were satisfied with the language of this final term sheet, and Comrie signed it on behalf of BIT on July 5, 2000.[39] On July 28, 2000, Cabletron announced publicly that GNTS would be the second Cabletron subsidiary to undergo an IPO, and Noell forwarded a copy of the press release to Comrie.[40]

D. *Negotiation Of The Stock Purchase Agreement*

The final term sheet formed the basis for negotiations of a definitive stock purchase agreement between the parties (the "Agreement"). Exhibit 7.11 to the Agreement was intended to incorporate the per-

---

30. DX 43.

31. Trial Tr. at 57–58.

32. *See* DX 22.

33. *Id.;* Trial Tr. at 58–59.

34. DX 22.

35. *See* DX 24.

36. DX 26.

37. *Id.*

38. DX 27.

39. DX 28.

40. PX 34.

tinent portions of Section 5 of the term sheet regarding the GNTS stock options.[41] While the various drafts of Exhibit 7.11 clarified and added new language to Section 5 of the term sheet, those drafts did not change its fundamental purpose and intent. Indeed, the critical language in dispute in this case—"equivalent substitute or replacement awards"—was carried over without change from the final version of the term sheet to the final version of Exhibit 7.11.

Two substantive changes from the final term sheet to Exhibit 7.11 require discussion. The first relates to the concept of a "Trigger Event." The Trigger Event was intended to be a mechanism by which the substitution provision contemplated by Section 5 of the final term sheet came into effect. This Trigger Event prompted Cabletron's obligations to issue equivalent substitute or replacement awards within 60 days of its "determination" not to conduct an IPO or spin-off of GNTS. As a result, the final language of Exhibit 7.11 in this regard provided:

> In the event that [Cabletron] determines not to pursue its current intention to cause GNTS to undergo an initial public offering prior to December 31, 2001 or determines not to pursue its current intention to distribute the stock of GNTS to the shareholders of [Cabletron] (each a "Trigger Event"), within sixty (60) days of the Trigger Event, [Cabletron] shall either (i) provide equivalent substitute or replacement awards on the same terms and conditions to the former employees of [BIT]; or (ii) pay $4,620,000

in the aggregate for all Options then held by the Partners and former employees of [BIT].[42]

The second significant change from the final term sheet to Exhibit 7.11 relates to what has come to be known as the "gross-up provision." BIT continually remained concerned about the ability to preserve a value for the GNTS stock options should Cabletron decide not to pursue an IPO or the IPO occurred on conditions different than stated. Accordingly, on August 16, Comrie e-mailed Cabletron's counsel seeking to "[protect] the value of the options" in the event that "the IPO does occur but under different valuations than established for purposes of this agreement."[43] In response to a request, BIT received another draft of Exhibit 7.11 that contained the gross-up provision. The new provision contained a formula that required an increase in the number of options issued to the BIT Group if the strike price of GNTS options continued to rise.[44] Thus, the gross-up provision addressed BIT's ongoing concern about possible increases in the strike price. This gross-up provision did not, however, address BIT's concerns about an IPO occurring at less than $15 per share. This remained a risk that BIT was willing to assume.

E. *Closing On The Agreement And Issuance Of The Original Options*

The Agreement was executed on August 23, 2000. On August 30, 2000, GNTS granted to the members of the BIT Group the options described in Exhibit 7.11. At the time of grant, each option had an

**41.** For example, the provision in Section 5 of the final term sheet that "[e]ach Optionee shall have an exercise price equal to the fair market value of the GNTS stock on the date of grant" was incorporated into Exhibit 7.11 without change. DX 29.

**42.** DX 29.

**43.** DX 64.

**44.** The parties agree that the reference to $12 in the fourth line of the gross-up provision is a typographical error and should in fact be $15. Trial Tr. at 82.

exercise price of $4.25, which, as Exhibit 7.11 required, represented "the fair market value of the Shares [of GNTS common stock] on the date of grant as determined in good faith by [GNTS]."[45] The options were granted pursuant to the following schedule: 25% of the options vested on August 30, 2001 and 1/36th of the remaining options vested at the end of each succeeding month until the options were 100% vested.[46] If, however, any member of the BIT Group holding GNTS options was terminated, then all unvested options he or she held were immediately extinguished and he or she had 90 days from the date of termination to exercise any options that had vested by that time.

F. *The Trigger Event And Issuance Of Replacement Options*

On July 16, 2001, Cabletron issued a press release announcing the sale of part of GNTS to "a private buyout firm in association with a group of current GNTS management," the absorption of the remaining GNTS operations into Aprisma Management Technologies and Enterasys Networks, Inc. (both Cabletron operating subsidiaries at the time), and a reduction in GNTS's workforce.[47] Thus, a Trigger Event occurred on or about July 16, 2001 because it was at that point that Cabletron had determined "not to pursue its current intention to cause GNTS to undergo an initial public offering prior to December 31, 2001."[48]

On August 23, 2001, Cabletron elected to provide the BIT Group holders of the original GNTS options substitute or replacement options pursuant to clause (i) of the substitution provision of Exhibit 7.11. Effective August 24, 2001, the original GNTS options were converted into options for shares of Enterasys. In late October 2001, Comrie received a document describing his replacement Enterasys stock options.[49] The replacement Enterasys options had an exercise price of $49.40, almost 5 times the then-current market price of Enterasys stock, which was $10.20.

Each BIT Partner received 4,801 Enterasys options in place of his 55, 814 original GNTS options. Enterasys's associate general counsel, Thomas Loureiro, calculated the strike price and the number of those options. Loureiro determined that Exhibit 7.11 required Enterasys, if it chose to issue replacement options to satisfy its obligations, to issue options that had the same "in the money" or "intrinsic" value as the GNTS options as of the date of replacement.

In calculating the "replacement ratio," Loureiro relied upon a "valuation" by Tork Johnson of Enterasys in connection with an "arm's-length negotiated offer" for GNTS made earlier that summer by a firm named Platinum Equity.[50] Loureiro took the $30.7 million valuation figure for GNTS from Johnson's hastily prepared handwritten calculations and divided it by approximately 35 million outstanding GNTS shares held by Enterasys, resulting in an alleged fair market value for GNTS

---

45. DX 74. This determination of fair market value represented a valuation of GNTS as a privately held entity.

46. *Id.*

47. DX 83. On August 6, 2001, the former Enterasys subsidiary was merged with and into Cabletron, with the surviving entity named Enterasys. The former BIT Group "eventually became employees of Enterasys." Trial Tr. at 92.

48. DX 29.

49. *See* DX 92.

50. Trial Tr. 404–05; *see also* DX 87. This "arm's-length offer" never actually occurred.

of \$.88 per share. Because the strike price on the 466,605 options held by the BIT Group was \$4.25 and fair market value of GNTS allegedly was \$.88 per share, Loureiro concluded that the "aggregate intrinsic value" of the original GNTS options was a *negative* \$1.573 million.[51] This value equates with the "aggregate intrinsic value" of the 40,140 replacement Enterasys options, which had a strike price of \$49.40 when its stock was trading at \$10.20.

### G. *Termination Of Plaintiffs' Employment*

On April 11, 2002, Enterasys notified the BIT Partners and the other former BIT employees that their employment was terminated. Each received a written termination notice, as well as a statement disclosing the number of vested replacement Enterasys options and explaining the circumstances under which those options could be exercised.[52] The BIT Group had 90 days to exercise their vested replacement Enterasys options, but nobody chose to do so because the options were hopelessly "under water" at that time. For example, Comrie would have had to pay almost \$94,000 to acquire 1,900 Enterasys shares that had a market value of approximately \$4,000.

### III.

The plaintiffs filed a complaint in this action in November 2001, alleging that Enterasys breached the Agreement, in partic- ular Section 7.11 and Exhibit 7.11 thereof, by failing either to replace their GNTS options with equivalent substitute or replacement awards, or to pay them \$4.62 million in cash. This complaint sought specific performance of the Agreement, an injunction against the alleged threatened breach of contact and compensatory damages for breach of contract. After the defendants moved to dismiss the original complaint, the plaintiffs filed, on February 22, 2002, an amended complaint that supplemented the factual allegations of the original complaint and added a claim for breach of the implied covenant of good faith and fair dealing. The defendants then moved to dismiss the amended complaint, and this court denied that motion by letter opinion dated June 27, 2002.[53] After the completion of fact and expert witness discovery, the defendants moved for summary judgment. On March 21, 2003, at the conclusion of arguments, this court denied the defendants' motion in its entirety. The matter was then tried before this court on April 22–24, 2003.[54]

### IV.

To succeed at trial, the plaintiffs must prove their case by a preponderance of evidence.[55] The trier of fact is charged with making determinations of the weight to be given to evidence adduced at trial.[56] In addition, " '[a] trial court may determine the weight and credibility to be accorded any witness,' and is responsible for

51. Trial Tr. 403; *see also* DX 89.

52. *See* PX 60; 61.

53. *See generally Comrie v. Enterasys Networks, Inc.*, 2002 WL 1466604 (Del.Ch. June 27, 2002). Both parties, however, consented to the dismissal of one defendant, GNTS (Canada) Inc. *See id.,* at *2.

54. In addition, a videotaped trial deposition of Noell, the defendants' chief fact witness, was taken in Houston, Texas on April 3, 2003 and viewed by the court as part of the trial.

55. *See, e.g., Heller v. Kiernan,* 2002 WL 385545, at *3 (Del.Ch. Feb.27, 2002), *aff'd,* 806 A.2d 164 (Del.2002).

56. *See Johnson v. Wagner,* 2003 WL 1870365, at *4 (Del.Ch. Apr. 10, 2003).

resolving conflicts in the evidence."[57] When "state of mind or 'consciousness and conscious' is involved, credibility—a [fact-finder] determination—is often central to the case."[58]

## V.

A. *The Plaintiffs' Interpretation Of Exhibit 7.11 Of The Agreement Is Correct*

1. *Applicable Principles Of Contract Interpretation*

■ The primary goal of contract interpretation is to "attempt to fulfill, to the extent possible, the reasonable shared expectations of the parties at the time they contracted."[59] In a dispute involving contract interpretation, the court must first examine the entire agreement to determine whether the parties' intent can be discerned from the express words used or, alternatively, whether its terms are ambiguous.[60] If the terms of the contract "are clear on their face, ... the court must apply the meaning that would be ascribed to the language by a reasonable third party."[61] If, however, the court concludes that a contract's terms are ambiguous or "fairly susceptible of different interpretations," the court may consider extrinsic

evidence to uphold, to the extent possible, the reasonable shared expectations of the parties at the time of contracting.[62] The extrinsic evidence the court may consider in such a circumstance includes "overt statements and acts of the parties, the business context, prior dealings between the parties, business custom and usage in the industry."[63]

■ When making a determination regarding the "shared intent" of the parties to an ambiguous contract, if a review of the extrinsic evidence does not lead the court to an "obvious" conclusion, the court may apply another principle:

> Only an objectively reasonable interpretation that is in fact held by one side of a negotiation and which the other side *knew or had reason to know that the first party held* can be enforced as a contractual duty. This principle is capable of resolving disputes arising from ambiguous contract language because it is logically impossible for a contracting party, operating in good faith, *both* to have a subjective interpretation of ambiguous language different from that of her counterparty *and* to know of her counterparty's differing interpretation.[64]

The foregoing has been called the "forthright negotiator principle."[65]

**57.** *Id.* (quoting *Jones v. Lang*, 591 A.2d 185, 188 (Del.1991)).

**58.** *Scott v. Bosari*, 1994 WL 682615, at *8 (Del.Super.Oct.26, 1994) (quotation omitted).

**59.** *U.S. West, Inc. v. Time Warner, Inc.*, 1996 WL 307445, at *9 (Del.Ch. June 6, 1996) (citation omitted).

**60.** *See In re Explorer Pipeline Co.*, 781 A.2d 705, 713 (Del.Ch.2001)

**61.** *True North Communications, Inc. v. Publicis, S.A.*, 711 A.2d 34, 38 (Del.Ch.1997), *aff'd*, 705 A.2d 244 (Del.1997) (TABLE); *see also Rhone–Poulenc Basic Chems. Co. v. American Motorists Ins. Co.*, 616 A.2d 1192, 1195 (Del.

1992) (clear and unambiguous language of a contract should be given its "ordinary and usual meaning").

**62.** *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del.1997).

**63.** *Supermex Trading Co., Ltd. v. Strategic Solutions Group*, 1998 WL 229530, at *3 (Del. Ch. May 1, 1998).

**64.** *U.S. West*, 1996 WL 307445, at *10; *see also Bell Atl. Meridian Sys. v. Octel Communications Corp.*, 1995 WL 707916, at *6 (Del.Ch. Nov. 28, 1995).

**65.** *U.S. West*, 1996 WL 307445, at *11.

## 2. The Agreement Is Ambiguous

The critical language in the contract—"equivalent substitute or replacement awards"—is ambiguous. As the positions of the parties in this litigation have demonstrated, such language is fairly susceptible to two different, yet reasonable, interpretations. The interpretation urged by the defendants is that this language required Enterasys, upon its determination not to proceed with an IPO, to provide substitution or replacement options valued at the same amount as the original GNTS options *at the date of replacement.* On the other hand, the plaintiffs argue that the same language obligates Enterasys to provide *substitute or replacement options* valued at the same amount as the GNTS options *at the date of issuance.* Thus, determining equivalence in this case is a matter of timing.

The defendants contend that "the parties anticipated that the required value of the replacement awards would change over time and would not be definitively known or knowable until the time of replacement." [66] To support this contention, they contrast the use of the indefinite word "equivalent" in clause (i) of Exhibit 7.11 and the actual dollar value in clause (ii) thereof. This argument does little to support the defendants' position. An equally plausible reason for not placing a specific dollar value in clause (i) may have been because the parties anticipated that any replacement awards would be options in a privately held company expected to undergo an imminent IPO on similar terms. To place a specific dollar value on such an opportunity may have been difficult, if not impossible. Whereas, if Enterasys wanted certainty, it was completely free to simply pay the $4.62 million provided for under clause (ii) of the substitution provision.

The plaintiffs, on the other hand, seem confused about what the plain meaning of clause (i) of Exhibit 7.11 requires. In their opening brief, they seem to imply that it guaranteed an "in the money" value of $4.62 million for the GNTS options.[67] In their discussion of the gross-up provision, which they rely heavily upon, however, the plaintiffs imply that the guaranteed "in the money" value of the original GNTS options was $5.016 million.[68] Which is it?

Neither of the interpretations the parties propose can be gleaned from a plain reading of the Agreement. Most significantly, despite the parties' reference to the word "equivalent" during the course of negotiations, it was never defined in the Agreement. Simple knowledge of the dictionary definition of the word "equivalent" does not help either. The commonly accepted definition of equivalent is "equal in force, amount, or value." [69] After reading the Agreement, the question remains when temporally "equivalence" is to be measured (*i.e.,* at the time of replacement or at the time of issuance). It is in this sense that the Agreement is ambiguous and the court must go beyond the Agreement's four corners to determine the answer.[70]

---

66. Def. Post Trial Ans. Br. at 55.

67. *See, e.g.,* Pl. Post Trial Op. Br. at 30–31 ("The only reasonable construction of clause (i) of the substitution provision ... required Enterasys ... to provide to the BIT Group a security ... *equal* in value to the contemplated $4.62 million *intrinsic value of the original* GNTS options that was specifically referenced in clause (ii)").

68. *See id.* at 28–29 (arguing that the gross-up provision only makes sense if an "in the money" value of the options was set at $5.016 million).

69. *Webster's Ninth Collegiate Dictionary* 421 (1987).

70. The court must note, however, that some provisions in the Agreement, and specifically in Exhibit 7.11, do tend to support the plaintiffs' argument. In particular, the gross-up

### 3. *The Plaintiffs' Interpretation Of Exhibit 7.11 Is The Most Reasonable*

■ The context of the negotiations surrounding the purchase of BIT amply demonstrates that in the event Cabletron determined not to pursue an IPO or a spin-off of GNTS, and Cabletron chose to comply with clause (i) of Exhibit 7.11, the BIT Group was entitled to replacement options that provided for an opportunity to participate in another IPO, or, in the alternative, was entitled to securities that compensated them for that lost opportunity.

From April 2000 through August 2000, GNTS was actively preparing for an IPO that it believed was virtually certain to happen. This is what the BIT Partners were told during the first meeting with representatives from Cabletron all the way through the negotiation of the term sheets and ultimately through execution of the Agreement. During that same period, no IPO price except $15 was ever discussed. The initial spreadsheets prepared by GNTS during the early stages of negotiations reflected a "BIT Valuation" of six times BIT's revenues, and illustrated how the BIT Partners would be compensated in the transaction.[71] The expected value of the options—at least half of the total acquisition consideration—remained constant at $4.62 million throughout most of the negotiations.[72] The defendants' witnesses all testified that because BIT was a services business, it was important to keep the BIT Partners "well incented" to continue working for GNTS by requiring them to accept stock options as a substantial part of the deal consideration and to sign employment contracts so that they could not "take the money and run."[73] The entire tone of negotiations essentially focused on how, not whether, the BIT Group was going to realize the value of those options.[74] The BIT Partners' main

---

provision seems to make the most sense if the options were intended at the time of contracting to have a specifically quantifiable "in the money" value. At the time the Agreement was signed, the parties expected an IPO to occur at $15. The strike price of the original GNTS options rose from $3 at the time the parties began negotiating to $3.50 at an interim stage, and finally to $4.25 as of August 1, 2000. The defendants acknowledge that before the options were actually issued, the strike price had the potential to rise as the IPO approached (assuming the strike price was equal to the fair market value of GNTS stock). Trial Tr. at 372–73; Noell 103. At a $4.25 strike price, the "in the money" or "intrinsic" value of the 466, 605 options subject to Exhibit 7.11 was $5.016 million: 466,-605 × ($15—$4.25). The gross-up provision was designed to maintain the $5.016 million value of the original GNTS options if the strike price rose between the execution of the Agreement and the actual issuance of the options. For example, if the strike price of the options increased from $4.25 to $5, the number of options issued pursuant to Exhibit 7.11 would increase proportionately to preserve the same "in the money" value that was calculated at $4.25. Applying the formula, the total number of options issued in such a hypothetical situations would be 501,600: (466,-605 × $10.75) / ($15—$5). Multiplying the quotient by the new pershare "in the money" value of $10 yields the same aggregate "in the money" value of $5.016 million.

71. Despite testimony that such a multiple was higher than Cabletron's alleged "3X rule of thumb" for acquisitions in early 2000 (Trial Tr. at 357–58), no GNTS or Cabletron representative ever told any of the BIT Partners that Cabletron would pay only three times revenue for BIT—or, for that matter, *any* multiple lower than six. *See* Trial Tr. at 99; *see also* Noell 112, 119).

72. Toward the end of negotiations, the expected value of the options rose to $5.016 million as more options were granted to members of the BIT Group.

73. Noell 18–19; PX 68 at 33.

74. Such exuberance most likely is related to the Internet bubble that began to deflate and then burst shortly after the Agreement was executed.

interest when they negotiated the "substitution provision" was to protect themselves against a serious obstacle to their ability to realize the value of the options: a unilateral decision of Cabletron not to conduct an IPO or spin-off for GNTS.[75]

The negotiation of the term sheets further supports the plaintiffs' position that both parties believed the original GNTS options would have a specific value based on an expected IPO price, and that the plaintiffs protected that value in the event that Cabletron unilaterally determined not to proceed with such an IPO. On June 14, 2000, the BIT Partners received the first draft of a term sheet. This initial draft provided no specific financial value to the proposed 385,000 GNTS stock options that were mentioned in Section 5. In a revised term sheet that the BIT Partners sent to Cabletron and GNTS on June 19, they proposed language in Section 5 that requested cash compensation for their options in the amount of $11.50 per option if the IPO did not occur, or was unsuccessful, or if GNTS were sold before an IPO.

On June 27, Cabletron responded to the BIT Partners' June 19 term sheet by essentially rewriting the relevant portion of Section 5. In particular, Cabletron expressly proposed in the draft to pay $4.62 million in cash if it withdrew the contemplated IPO or spin-off and did not "provide substitute or replacement awards." [76] The BIT Partners did not believe that the language proposed in the June 27 draft adequately protected the value of potential replacement awards so they added the restrictive word "equivalent" in their June 29 term sheet. Cabletron clearly recognized the importance of the word "equivalent," as demonstrated by its overt act of remov-

ing the word from the very next draft of the term sheet that was sent to the BIT Partners on June 30.[77] It was only at the continued insistence of Comrie, and after e-mail exchanges between Comrie and Noell, that Cabletron finally agreed that it was willing to accept the term "equivalent" as the antecedent to the phrase "substitute or replacement awards."

Finally, the drafting history of Exhibit 7.11 suggests that Cabletron knew that it was guaranteeing some value to the holders of GNTS options should Cabletron choose not to cause GNTS to undergo an IPO. In particular, the insertion at BIT's suggestion of the gross-up provision, containing a formula that provided for an increase in the number of options as the strike price increased, shows that the defendants understood that the "in the money" value of the options, assuming full vesting and a $15 per share IPO, was equal to $5.016 million.[78] Because the gross-up provision only makes sense if a $15 per share IPO value is used, it provides substantial evidence that Cabletron understood the original GNTS options to have value based on that anticipated offering. Thus, for any substitute or replacement award to truly be "equivalent," such value must be preserved.

In contrast, the defendants have failed to show that the BIT Partners had, or should have had, knowledge of the defendants' position that, if no IPO occurred, the BIT Group was subject to a substitute or replacement award of options having the same "in the money" value as the original GNTS options *at the time of replacement without reference to any anticipated IPO price.* The defendants were unable to provide any documentary evi-

---

**75.** *See* Trial Tr. at 212–213; Noell 123.

**76.** DX 20.

**77.** *See* DX 24.

**78.** *See* note 69, *supra.*

dence to demonstrate that such a concept was conveyed to the BIT Partners. Nor did any written communications use the term "market risk," whether pre-IPO or post-IPO, and Noell's recollection of conversations with Comrie on the subject of "market risk" focused on " 'what if' scenarios ... all related to pre-IPO actions." [79] That is consistent with the chief risk identified by the BIT Partners, which was getting to the IPO in the first place so their options had a chance to be exercised. [80]

For all of these reasons, the court concludes that the term "equivalent" as used in Exhibit 7.11 of the Agreement required Cabletron to issue substitute or replacement awards equal in value to the original GNTS options *at the date of grant* as opposed to options that were equal in value *at the date of replacement*. Because Cabletron chose to issue options having a value equal to the original GNTS options at the date of replacement, rather than at the date of grant, it has breached its obligations under the Agreement. [81]

**B.** *The Plaintiffs Are Entitled To An Award Of Damages Equal To The Value Of The Original GNTS Options At The Date Of Grant*

 1. *Breach Of Contract Standard For Damages Awards*

 The basic rules of contract damages in Delaware are well settled:

[T]he standard remedy for breach of contract is based upon the reasonable expectations of the parties *ex ante.* This principle of expectations damages is measured by the amount of money that would put the promisee in the same position as if the promisor had performed the contract. Expectation damages thus require the breaching promisor to compensate the promisee for the promisee's reasonable expectation of the value of the breach of contract, and, hence, what the promisee lost. [82]

 Damages are to be measured as of the time of the breach. In this case, the breach occurred when Enterasys issued replacement options on August 24, 2001. Although the breach occurred on August 24, 2001, the court may consider events that took place after that date in order to aid in its determination of the proper expectations as of the date of breach. For example, the court will take into account the fact that the employment of the BIT Group was terminated on April 11, 2002.

 2. *The Plaintiffs' Award Is Limited To Clause (i) Of The Substitution Provision Because Exhibit 7.11 Is A True Alternative Contract*

Based upon the plain language of Exhibit 7.11, the substitution provision contemplates Enterasys's performance under *either* clause (i) or clause (ii) would discharge its obligation to the holders of the original GNTS options if it determined not

---

79. Noell 80.

80. Trial Tr. at 212–13.

81. Because the court has found a breach of the Agreement, it need not address the plaintiffs' arguments regarding the implied covenant of good faith and fair dealing. The plaintiffs' counsel conceded at the post-trial arguments that such an argument was pleaded in the alternative to the breach of contract claims. In other words, the implied covenant of good faith and fair dealing need only be addressed if the court did *not* find a breach of the Agreement.

82. *See Duncan v. TheraTx, Inc.,* 775 A.2d 1019, 1022 (Del.2001); *see also Genencor Int'l, Inc. v. Novo Nordisk A/S,* 766 A.2d 8, 11 (Del.2000) ("remedy for a breach should seek to give the non-breaching party the benefit of its bargain by putting that party in the position it would have been but for the breach").

to undertake an IPO involving GNTS. It is in fact a true alternative contract. As such, the plaintiffs are not entitled to a remedy awarding them damages under clause (ii) of the substitution provision. Rather, a remedy must comply with clause (i).

"An alternative contract is one in which a party promises to render some one of two or more alternative promises, either one of which is mutually agreed upon as the bargained-for equivalent given in exchange for the return performance by the other party."[83] Whether an agreement is a true alternative contract depends on the substance of the transaction, not its form.[84] Finally, equivalency between the choices in a contract is not required for it to be considered alternative. Rather, for a contract to be deemed alternative, there must only be a "reasonable relationship between the alternatives."[85] Clause (i) and clause (ii) of the substitution provision bear such a "reasonable relationship."

To determine whether there is a "reasonable relationship" between alternatives, the court must compare the "relative value of the alternatives" at the time of contracting.[86] Because the court has concluded that clause (i) of the substitution provision obligated Enterasys to provide equivalent substitute or replacement option as of the date of grant, the "relative value" of clause (i) and clause (ii) are roughly equal. The value of clause (ii) is certain and clear: $4.62 million. The value of clause (i) is far less certain. Assuming the original GNTS options were fully vested and not subject to extinguishment upon termination of the former BIT employees, they had an expected "in the money" value of $5.016 million and a Black–Scholes valuation of $5.53 million.[87] These relative values are close enough to result in a conclusion that clauses (i) and (ii) bear a "reasonable relationship" to one another. This is particularly true because, although clause (i) appears to have a higher valuation, it was also accompanied by such risks to the BIT Group as a four-year vesting schedule and the possibility that termination would result in the extinguishment of all unvested options. Moreover, upon termination, the BIT Group had only 90 days to exercise any vested options. For these reasons, the court concludes that Exhibit 7.11 is a true alternative contract.

Because Exhibit 7.11 is an alternative contract that gave Enterasys the power of election, its choice on August 24, 2001 to issue replacement options to the BIT Group fixed the parties' respective rights

83. *Eagle Star Ins. Co. Ltd. v. Seneca Ins. Co., Inc.*, 1995 WL 733642, at *3 (S.D.N.Y. Dec. 12, 1995) (quoting 5 *Corbin, Contracts* § 179).

84. *See Chandler v. Doran Co.*, 44 Wash.2d 396, 267 P.2d 907, 910 (1954).

85. *Bellevue School District No. 405 v. Bentley*, 38 Wash.App. 152, 684 P.2d 793, 796 (1984); *see also Gronemeyer v. Hunter Mfg. Corp.*, 106 A.2d 519, 524 (Del.Ch.1954) (holding the defendant liable under an alternative contract because the court found that it had "elected one of two reasonable alternatives"); *G.E.J. Corp. v. Uranium Aire, Inc.*, 311 F.2d 749, 753 (9th Cir.1962) (a contract is not alternative if the performances are of such unequal burden that it is unrealistic to suppose that the prom-

isor would elect to perform any but the easier).

86. *Chandler*, 267 P.2d at 912.

87. *See generally* PX 71. The Black–Scholes model is a complicated valuation formula based on risk arbitrage theory. The model requires five separate "inputs": the value of the security underlying the options, the exercise price, the time to maturity of the options, an interest rate and the volatility of the stock price. *See* Trial Tr. at 236–37. This court has recognized the Black–Scholes model as "the leading option pricing model." *In re Coleman Co., Inc. S'holders Litig.*, 750 A.2d 1202, 1208 n. 13 (Del.Ch.1999).

and obligations according to the alternative elected, namely, clause (i).[88] Therefore, the plaintiffs cannot now obtain an award under the rejected alternative form of performance—the cash payment under clause (ii)—simply because they may be better off now as a result of the defendants' performance under that clause.[89]

3. *The Value Of Clause (i) Of The Substitution Provision As Of The Date Of Grant But Accounting For The BIT Group's Termination*

Damages are somewhat speculative in this case. Such uncertainty, however, is not the fault of the BIT Group. Rather, the uncertainty has been caused by Enterasys's failure to provide equivalent substitute awards to holders of the original GNTS options. Thus, to the extent the court has to resolve uncertainties, those uncertainties will be resolved in the plaintiffs' favor.[90] The court will, however, take into consideration the realities surrounding this litigation. For example, the court when fashioning its award will account for the fact that the BIT Group was fired in April 2002.

The court begins its damages determination by accepting the analysis of the plaintiffs' expert, Dr. Gregg Alan Jarell.[91] Dr. Jarell credibly testified that, without considering the vesting and employment contingencies that will be discussed later, Enterasys would have had to supply the BIT Group with 686,184 Enterasys options at a strike price of $2.89 for the award to be equivalent to the value of the original GNTS options at the date of grant.[92] This calculation is based on the $10.20 closing price for shares of Enterasys on August 24, 2001, the date when the replacement Enterasys options were issued. Based upon this computation, "[b]oth the replacement options and the GNTS options would have had an intrinsic value of approximately $5.016 million.[93]

Dr. Jarell's valuation is flawed in that he failed to consider that the original GNTS options granted to the BIT Group were subject to two significant contingencies. First, they vested over a period of four years. Second, if a member of the BIT Group was terminated, all unvested options granted up to that point were automatically extinguished, and all vested options had to be exercised within 90 days of the date of termination. These contingencies had the potential to be quite draconian. Dr. Jarell did not account for them because, he explained, the valuation mod-

88. See *Eagle Star Ins. Co. Ltd.*, 1995 WL 733642, at *3; *Gronemeyer*, 106 A.2d at 524.

89. See *Fidelity Fed. Sav. & Loan Ass'n v. Pioneer Nat'l Title Ins. Co.*, 428 F.Supp. 1382, 1387 (S.D.Ill.1977).

90. See, *e.g.*, *Duncan*, 775 A.2d at 1023 (explaining this principle in the context of a breach of contract for suspension of trading period for restricted stock).

91. The court does not accept the testimony of the defendants' expert witness, Michael P. Lynch, because his valuation of BIT is unsupported by the realities of the transaction. In particular, he concluded that the value of BIT was "approximately $4.7 million." DX 98. This valuation is clearly erroneous, however, because GNTS had always represented to BIT that it was willing to pay at least 6 times and up to 7 times BIT's revenues, which resulted in a valuation between $8.8 million and $10.23 million, of which approximately $5.6 million was paid in cash. Moreover, the court does not accept Lynch's valuation of the original GNTS options relative to the replacement Enterasys options because his calculations are based on the idea that the strike price was equal to the fair market value of GNTS at the date of grant. He did not consider the fact that a $15 IPO was expected to be a near certainty at the time of grant.

92. See PX 71 at 13.

93. *Id.*

els available were not sophisticated enough to accomplish such a task.[94] The court, however, will account for them by considering the realities of the situation—*i.e.* the BIT Group was actually fired on April 11, 2002. At that point, 39.5831% of the original GNTS options granted would have vested. This percentage is based on the fact that 25% of the original GNTS options vested on August 30, 2001, and 1/36 of the remaining unvested options vested on the last day of each month thereafter.[95]

The court reaches its damages determination based primarily on the teachings of the Delaware Supreme Court in *Duncan v. TheraTx, Inc.* In *Duncan*, the court held that damages could be based on an estimate of hypothetical sales "by identifying a reasonable period after the restriction was imposed during which the stockholders could have sold the shares and then selecting the 'highest intermediate price' during that period as the presumed sale price."[96] In addition, the *Duncan* court held that "[t]he 'reasonable time' in this context is the 'time in which [the plaintiff] could have disposed of its shares without depressing the market had it been able to do so.'"[97] This rule attempts to balance two concerns. First, the "issuer-defendant[s] should bear the risk of uncertainty in the share price because the 'defendant[s]' acts prevent a court from determining with any

degree of certainty what the plaintiff[s] would have done with [their] securities had they been freely alienable."'[98] Second, the "issuer-[defendants] should not bear the risk of all subsequent share price increases because it is impossible to know whether and when the stockholders actually would have sold their shares during the restricted period."[99]

With this backdrop in mind, the court concludes that the "reasonable period" for determining the "highest intermediate value" upon which holders of the original GNTS options would have exercised their replacement awards and sold the underlying shares is 90 days from the date of vesting. This period of time comes from the fact that, upon termination, the BIT Group had 90 days to exercise all vested options. The only exceptions to the application of this conclusion relate to the first and second grant of options. Although those tranches of options were granted on August 30 and September 30, 2001, respectively, the BIT Group would have had no way of knowing that they could have exercised those options because they had not been provided notice of the grant of replacement options until October 15, 2001.[100] Thus, for those two tranches, the court will consider the highest intermediate price within 90 days of October 15, 2001.[101]

---

94. *See* Trial Tr. at 325–30.

95. *See* DX 74.

96. *Duncan*, 775 A.2d at 1023 (citation omitted); *see also American Gen. Corp. v. Continental Airlines Corp.*, 622 A.2d 1, 13 (Del.Ch. 1992), *aff'd*, 620 A.2d 856 (Del.1992) (TABLE) ("the date for determining the 'highest intermediate value' is established by resort to a 'constructive replacement' purchase [or sale] by the plaintiff, *i.e.*, how long it would have taken the plaintiff to replace [or sell] the securities on the open market").

97. *Duncan*, 775 A.2d at 1023 n. 9 (quoting *Madison Fund, Inc. v. Charter Co.*, 427 F.Supp. 597, 609 (S.D.N.Y.1977)).

98. *Id.* at 1023 (quoting *American Gen. Corp.*, 622 A.2d at 10).

99. *Id.* at 1023–24 (citation omitted).

100. *See* DX 92.

101. The court bases its damages award on the closing share price for Enterasys stock rather than the highest intraday trading price of the stock. *See American Gen. Corp.*, 622 A.2d at 13 (basing damages award on closing stock prices).

As already discussed, had Enterasys properly provided equivalent substitute or replacement awards of Enterasys options, those options would have had a strike price of $2.89. Moreover, the court concludes that the shares covered by the options vesting on August 30, September 30, October 31, and November 30, 2001, would have all been sold on December 11, 2001, when the closing price of Enterasys stock was $11.80 per share. In that case, a total of 214,431 shares of Enterasys would have been sold, yielding proceeds of $2,530,286, which would have resulted in a profit to the BIT Group of $1,910,580 .[102] The court next concludes that the shares covered by the options vesting on December 31, 2001 and January 31, 2002, would have been sold on January 31, 2002 at a share price of $11.02. Each of those grants was for 14,295 options. Such a sale would have produced proceeds of $315,062 and a net gain on the options of $232,437. The 14,-295 Enterasys shares covered by the options vesting on February 28, 2002 would have been sold for $4.97 on March 8, 2002, producing $71,046, resulting in a net profit on the options of $29,734. Finally, the Enterasys shares covered by the options vesting on March 31, 2002 would have been sold on April 4, 2002 at $4.14, netting a profit on those options of $17,869. None of the other granted options would have vested before the BIT Group was terminated on April 11, 2002.

Adding the profit on each of those option exercises together produces a total profit on all the vested Enterasys options of $2,190,620. The court notes that the named plaintiffs in this action held only 59.8% of the GNTS options. Former employees of BIT held the remainder. For this reason, the named plaintiffs are only entitled to an award of $1,309,991. It is entirely plausible, however, that the BIT employees who were not plaintiffs in this action are third-party beneficiaries to the Agreement, and are equally entitled to an award based on a breach of that Agreement. The court, therefore, will not enter final judgment in this action for 30 days after the issuance of this opinion. During that time, the court instructs the plaintiffs to provide notice to potential third-party beneficiaries in this action so that they may, if they choose, intervene in this action to seek recovery.

## VI.

For the foregoing reasons, judgment will be entered in favor of the plaintiffs. The plaintiffs are instructed to present an order in conformity with this opinion within 10 days.

---

**102.** This calculation is based on a $2.89 strike price for the Enterasys options (*i.e.*, 214,431 × ($11.80—$2.89). The court assumes that the sale of the underlying shares upon exercise would not have materially altered the price of Enterasys stock. *See, e.g.*, 14 C.F.R.

§ 230.144. The court notes that the average daily volume of Enterasys shares bought and sold that week was 1,094,000 shares. Thus, a sale of 214,431 shares would have represented less than 20% of the average daily volume of Enterasys stock.