# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

ZAYO GROUP, LLC,        :

           Plaintiff,       :

                     :

           v.               :       **C.A. No. 12874-VCS**

                     :

LATISYS HOLDINGS, LLC,      :

                     :

           Defendant.     :

                     :

## MEMORANDUM OPINION

Date Submitted: September 5, 2018
Date Decided: November 26, 2018

Elizabeth S. Fenton, Esquire and Scott W. Perkins, Esquire of Saul Ewing Arnstein & Lehr LLP, Wilmington, Delaware, Attorneys for Plaintiff Zayo Group, LLC.

Philip Trainer, Jr., Esquire and Marie M. Degnan, Esquire of Ashby & Geddes, Wilmington, Delaware and Mark D. Cahill, Esquire, Phoebe Fischer-Groban, Esquire and Christina GT. Lau, Esquire of Choate Hall & Stewart LLP, Boston, Massachusetts, Attorneys for Defendant Latisys Holdings, LLC.

**SLIGHTS, Vice Chancellor**

In law, as in life, the well-known principle of *caveat emptor* ("let the buyer beware") comes as a rude awakening to many-a-buyer. The principle was graphically illustrated and perhaps first embraced as a canon of our commercial law in the seminal *Laidlaw v. Organ*.[1] During the War of 1812, the British successfully suppressed the free flow of American trade, depressing the price of tobacco trapped within the United States. The Treaty of Ghent officially ended the war on Christmas Eve 1814. Ships carrying news of the Treaty were dispatched and reached New Orleans weeks later. Before the ships' couriers could deliver official news of the armistice, the news was leaked to a tobacco buyer named Organ. Armed with this non-public information, Organ rushed to Laidlaw & Company at dawn the next day eager to close a previously negotiated deal to purchase 111 "hogsheads" (120,715 lbs.) of tobacco. Sensing Organ's urgency, Laidlaw's representative asked Organ if there was some reason for his haste. Organ said nothing of the peace and the tobacco deal closed that morning. Later that day, in reaction to news that the foreign tobacco markets had re-opened, the price of tobacco jumped by fifty percent. Angered by Organ's "deception," Laidlaw forcibly seized the tobacco it had sold to Organ. Organ then sued for its return. The case reached the United States Supreme Court two years later.

---

[1] Laidlaw *v. Organ*, 15 U.S. (2 Wheat.) 178 (1817).

Writing for the majority, Chief Justice Marshall ruled, "[Organ] was not bound to communicate [his knowledge of the armistice]. . . . . 'It is no more forbidden to sell at the current price, without disclosing the circumstances which may cause it to fall, than it is to buy without communicating those which may cause it to rise.'"[2] While our common law and our Uniform Commercial Code have eased the harsh reality of *caveat emptor* somewhat, its core doctrinal premise remains in our law today. Buyers, indeed, must beware. If they want to manage risk, they are well-advised to address and allocate it clearly in their contracts.

In this case, an unhappy buyer of a company has sued the seller for breach of contract. The seller and buyer agreed that if any of the buyer's most valuable customers cancelled or modified their contracts with the seller before the closing, the seller would disclose that fact to the buyer. The seller and buyer did not agree, however, that the seller would advise the buyer if any of these customers elected not to renew one of their contracts. After the transaction closed, the seller discovered that certain major customers had elected or were electing not to renew their contracts. This litigation ensued.

---

[2] *Id.* at 194, 185 n.C (internal quotation omitted).

At bottom, this case involves sophisticated parties bargaining to allocate risk through carefully negotiated warranty and indemnification provisions in their agreement of sale. Delaware is a contractarian state.[3] Our courts honor and enforce the bargain struck. That is what must be done here.

In this post-trial Memorandum Opinion, I conclude: (1) Plaintiff has not proven that Defendant breached the operative contract; and (2) in any event, Plaintiff has not proven its damages above the bargained-for contractual thresholds that limit its damages recovery. My verdict, therefore, is for Defendant.

## I. FACTUAL BACKGROUND

I have drawn the facts from the parties' pre-trial stipulation, evidence admitted at trial and those matters of which the Court may take judicial notice.[4] The trial

---

[3] *See, e.g.*, *Interim Healthcare, Inc. v. Spherion Corp.*, 884 A.2d 513, 551 n.305 (Del. Super.), *aff'd*, 886 A.2d 1278 (Del. 2005) (TABLE) ("Delaware courts do not rescue disappointed buyers from circumstances that could have been guarded against through normal due diligence and negotiated contractual protections."); *VGS, Inc. v. Castiel*, 2004 WL 876032, at *6 (Del. Ch. Apr. 22, 2004) (finding that a sophisticated investor's failure to recognize the importance of a contract that was made available during due diligence diminished the plaintiffs' fraud and breach of contract claim); *Debakey Corp. v. Raytheon Serv. Co.*, 2000 WL 1273317, at *26–28 (Del. Ch. Aug. 25, 2000) (finding that a sophisticated party's failure to conduct adequate due diligence or to procure express warranties for facts that it supposedly relied upon in entering a transaction made it impossible to prove justifiable reliance. Instead, this behavior indicated the sophisticated party made a business decision it was willing to accept in order to complete the deal quickly and cheaply, a decision the court would not second-guess.).

[4] I cite to the Verified Complaint as "Compl. ¶"; the Joint Pre-Trial Stipulation and Order as "PTO ¶"; the joint trial exhibits as "JX #"; and the trial transcript as "Tr. # (witness name)."

4

record consists of 494 joint trial exhibits, 803 pages of trial testimony and 17 lodged depositions. The following facts were proven by a preponderance of the competent evidence.

**A. Parties and Relevant Non-Parties**

Plaintiff, Zayo Group, LLC ("Zayo"), is a Delaware limited liability company headquartered in Boulder, Colorado.[5] Zayo is a publicly traded company that provides high-capacity dark fiber, wavelength, IT infrastructure services and Ethernet products and services.[6] Since its founding, it has made forty-one acquisitions of fiber and data center companies, averaging about three to four acquisitions per year.[7]

Defendant, Latisys Holdings, LLC ("Latisys"), is a Delaware limited liability company, founded in late 2007 by Pete Stevenson, Doug Butler and Evans Mullan.[8] Before the execution of the Stock Purchase Agreement, Latisys owned all of the issued and outstanding stock of (1) Latisys Holdings Corp., (2) Latisys-Chicago Holdings Corp. and (3) Latisys-Ashburn Holdings Corp. (collectively, the "L-

---

[5] Compl. ¶ 8.

[6] Tr. 11–16 (Reardon).

[7] Tr. 71–72 (Reardon).

[8] Def. Pre-Tr. Br. at 6; Compl. ¶ 9.

Companies").[9]   At the time of the acquisition, Latisys offered a collection of IT infrastructure services, including data center colocation services, managed hosting services, and enterprise and public cloud services.[10]  It operated out of eight data centers in the United States, as well as a cloud storage platform in London.[11]

Non-party, Great Hill Partners, LP ("GHP"), is a growth private equity firm based in Boston, Massachusetts.[12]  GHP made the initial equity investment in Latisys that allowed Latisys to make its first data center acquisitions in Orange County, California and Denver, Colorado.[13]   It ultimately became Latisys' majority shareholder through various GHP investment funds.[14]

Non-party, DH Capital, is the investment bank Latisys engaged to run its sales process.[15]  Non-party, Pete Stevenson, was Latisys' Chief Executive Officer.[16]  He, along with the rest of Latisys' management team, left the company shortly after the

---

[9] Compl. ¶ 9; PTO ¶ 1.

[10] JX 62.

[11] *Id.*

[12] PTO ¶ 1.

[13] Tr. 487 (Stevenson).

[14] Tr. 487 (Stevenson).

[15] PTO at 3; *see* JX 31.

[16] Tr. 495 (Stevenson).

acquisition.[17]  Non-party, Doug Butler, was Latisys' Chief Financial Officer.[18]  Non-party, John Hayes, was the Managing Partner at GHP at the time of the transaction.[19]  He is one of the three founders of GHP.[20]  Non-party, Dan Glisky III, was the chief architect of Zayo's financial model for evaluating Latisys.[21]  And, non-party, Scott Reardon, was Zayo's former head of corporate development.[22]

**B. The Business of Latisys: Clouds, Customers and Contracts**

Two types of contracts governed Latisys' relationships with its customers: Master Services Agreements ("MSAs") and Service Order Forms ("SOFs").[23]  MSAs governed the customer relationship at a macro level.[24]  SOFs specified the services the customer purchased, the prices and rates, the monthly recurring charges to the customer, the contract term and the details of any one-time optional renewal

---

[17] PTO at 30.

[18] Tr. 354 (Butler).

[19] Tr. 7 (Hayes).

[20] Tr. 417 (Hayes).

[21] Tr. 92 (Reardon).

[22] Tr. 7 (Reardon).

[23] Tr. 238 (Butler).

[24] Tr. 238–41 (Butler).

periods for the SOF.[25]  Put simply, the SOFs drove the customer relationship and marked its contours.[26]

Latisys customers often entered into one or more SOFs to cover the majority of their services ("parent" SOFs).[27]  They would then add SOFs as needed over time for additional products and services ("add-on" SOFs).[28]  The parent and add-on SOFs usually expired at the same time.[29]  The average term of a Latisys SOF was three years.[30]

When a customer's SOFs expired, the customer was "out of contract" with Latisys.[31]  Latisys would then provide services to the customer under the terms of the expired SOF on a month-to-month basis.[32]  Once the customer entered this month-to-month phase, it could terminate its services with Latisys with thirty days'

---

[25] *Id.*

[26] *Id.*

[27] *Id.*

[28] *Id.*

[29] Tr. 242–43 (Butler).

[30] Tr. 239 (Butler).

[31] Tr. 242–44 (Butler).

[32] *Id.*

notice.[33]  Approximately thirty percent of Latisys' revenue was month-to-month.[34] In other words, thirty percent of the company's revenue was guaranteed only for thirty days.[35]  Latisys' average customer tenure—in contrast to the average term of Latisys' SOFs—was about four and a half years.[36]

Latisys' customers' needs naturally fluctuated over the duration of their relationship with Latisys.[37]  It was common for customers to require less storage space after they developed their own ability to perform the functions they had relied on Latisys to provide.[38]  As the expiration of their SOF term approached, Latisys customers routinely would negotiate new SOFs with Latisys on more favorable terms.[39]  "More-for-less" was the mantra that the Latisys sales force regularly confronted as SOFs expired.[40]

---

[33] *Id.*

[34] Tr. 251 (Butler).

[35] *Id.*

[36] Tr. 500 (Stevenson).

[37] Tr. 248–49 (Butler).

[38] *Id.*

[39] *Id.*

[40] Tr. 248 (Butler).  ("Q. Was it routine that customers at the end of a SOF term would renegotiate with Latisys for more or different services?  A. . . . You know, they'd always want to get more for less . . . .").

Latisys always aimed to renew customer contracts in order to lock down the resulting cash flow.[41] With market prices declining, however, Latisys often needed to make concessions in order to keep customers.[42] This meant that Latisys would have to accept either pricing discounts in return for restored space or a longer contract term.[43] While not optimal, this strategy eventually created more guaranteed revenue.[44]

## C. Latisys Decides to Explore a Sale

Latisys' investors and the Latisys Board of Directors decided by late spring 2014 that it was appropriate to consider strategic alternatives for Latisys, including a sale of the company.[45] By June of that year, Latisys had executed an "Engagement Agreement" with DH Capital in order to move forward with a potential sales process.[46] DH Capital dubbed the process "Project Caribou."[47]

---

[41] Tr. 237 (Butler); Tr. 490–91, 494 (Stevenson).

[42] Tr. 491–92 (Stevenson); JX 430 at 23 (former Latisys Senior Sales Account Manager Bill Rowcliffe made clear that "[p]ricing in this industry is—is slowly dissipating. It's going down.").

[43] Tr. 249–50 (Butler); Tr. 489–90, 494–95 (Stevenson).

[44] *Id.*

[45] Def. Post-Tr. Br. at 7.

[46] PTO ¶ 3; *see* JX 31.

[47] Def. Post-Tr. Br. at 7. *See also* Tr. 441 (Hayes).

In October 2014, DH Capital provided a group of potentially interested buyers, including Zayo, a Confidential Information Memorandum ("CIM") that contained detailed information about Latisys.[48] Among the data laid out in the CIM were summaries of Latisys' products and data centers, customer operations and revenue, and historical and projected financial performance.[49]

The CIM's Customer Overview slides made clear that the average tenure for a Latisys' customer was about four and a half years.[50] These slides also highlighted that Latisys had "[m]ore than $157 million in remaining contract value and two-thirds contracted beyond 12 months."[51] The CIM's contract waterfall schedule broke down Latisys' customer contracts by the amount of time remaining on the customers' contracts, which ranged from fewer than six months to over two years.[52] For each band of customers, the waterfall indicated the value remaining on each contract.[53]

---

[48] PTO ¶ 4; *see* JX 62; *see also* Tr. 23 (Reardon).

[49] JX 62.

[50] *Id.*

[51] *Id.*

[52] *Id.*

[53] *Id.*

DH Capital forwarded the first-round process letter to potential buyers, including Zayo, on Halloween of 2014.[54] The process letter requested non-binding indications of interest by November 18, 2014.[55] The letter also instructed bidders to include a proposed purchase price along with the bidder's basis for the valuation.[56]

A day after the stated deadline, Zayo submitted its initial indication of interest to acquire Latisys.[57] Zayo "propose[d] a total value in the range of $625M – $655M in cash (approximately 11 – 11.5x Q4 2014E LQA Adjusted EBITDA of $56.8M) on a cash-free, debt-free basis."[58] According to Zayo, its "[v]aluation [was] based on the Company's guidance of $56.8M of LQA Adjusted EBITDA in fourth quarter 2014."[59] Zayo acknowledged that "[t]hrough the due diligence process, [it would need] to validate this assumption as well as the near and long-term cash flow outlook for the business."[60]

---

[54] PTO ¶ 5; *see* JX 70.

[55] PTO ¶ 5; *see* JX 70.

[56] PTO ¶ 5; *see* JX 70.

[57] PTO ¶ 8; *see* JX 109.

[58] JX 109.

[59] *Id.*

[60] *Id.*

## D. Zayo Due Diligence

On November 20, 2014, the day after sending its interest letter, Zayo sent Latisys a set of diligence requests.[61] DH Capital responded on November 26, 2014, by sending Zayo a spreadsheet that displayed for each customer (not identified by name) the contract expiration dates and the customer's monthly recurring revenue by location and product.[62] The response also included bookings and "churn"—loss resulting from customer turnover—information for 2013 and 2014.[63]

Eight bidders, including Zayo, were invited to participate in round two of Project Caribou.[64] Further due diligence ensued.[65] On December 16, 2014, Latisys shared an "EBITDA Bridge" with Zayo, displaying its actual revenue and expenses in October 2014, and its projections for November 2014 through March 2015.[66]

---

[61] PTO ¶ 9; *see* JX 111.

[62] PTO ¶¶ 9–10; *see* JX 111, 122.

[63] PTO ¶ 10; *see* JX 122.

[64] PTO ¶ 11; *see* JX 112.

[65] PTO ¶ 11; *see* JX 112.

[66] PTO ¶ 12; *see* JX 151. DH Capital noted "dialogue and diligence calls with Zayo's corporate development team" with "[a]reas of diligence focus . . . includ[ing] Bridge to Q1-2015 unadjusted EBITDA . . . ." JX 153 at 5.

Importantly, during diligence, Zayo was provided with all of the MSAs and SOFs for Latisys' top thirty customers by monthly recurring revenue ("MRR") in the Project Caribou virtual data room ("VDR").[67]  With this data in hand, Zayo's deal team could assess all of the MSAs and SOFs before Zayo signed the Stock Purchase Agreement ("SPA").[68]  As a result, Reardon could attest that Zayo knew from diligence the exact number of months remaining on Latisys' contracts with its top thirty customers by MRR.[69]

Glisky, the financial analyst on Zayo's deal team, incorporated the information provided in the VDR, including the comprehensive customer base data, into his financial model.[70]  The "MRR by Cust" tab of Glisky's financial model lists each Latisys customer by size of MRR.[71]  It also displays the date the customer first

---

[67] PTO ¶ 18.

[68] Tr. 126–27 (Reardon); JX 212 at 5.

[69] Tr. 125 (Reardon) ("Q. Fair to say that as part of the customer due diligence, you and Zayo and others on your deal team knew what the remaining terms were on the top 30 customer contracts?  A. Yeah.  They varied by service, by underlying service; but I believe that we had that—that detail.").

[70] JX 253; Tr. 260:1–3, 261:24–262:1–11 (Glisky).

[71] JX 253.

began purchasing services from Latisys, the expiration date of the customer's SOFs and the customer's MRR by product and location.[72]

Glisky's model calculated how many months of revenue remained under contract for each customer and how much revenue was guaranteed for each of Latisys' customers.[73] The model assigned an "expiration profile" to each customer based on the amount of time remaining before the customer's contracts with Latisys expired, which were: "> 2 Years," "1-2 Years," "6 Mo's – 1 Year," "< 6 Mo's" and "MTM."[74] At the time Glisky constructed his model, he knew only the code names "TOSH," "ADD2," "ECHO," "ITCO," and "LEXI" for the five customers at issue in this case—respectively Toshiba American Information Systems, Inc. ("Toshiba"), Add2Net, Inc. ("Add2Net," a.k.a. "Lunarpages"), IT Convergence ("ITC") and LexisNexis.[75] Zayo received a key to the customer names on January 5, 2015.[76]

---

[72] *Id.*

[73] Tr. 262:8–22, 266:6–19 (Glisky); JX 253.

[74] JX 253. "MTM" means month-to-month. Tr. 271:18–20 (Glisky).

[75] Tr. 32 (Reardon) ("[T]here's always sensitivity to providing customer names . . . .").

[76] JX 188; Tr. 125:7–14 (Reardon); PTO ¶ 24.

Glisky's analysis showed that Toshiba and IT Convergence were out of contract with only one more month of guaranteed revenue.[77]  It also revealed that Echopass and LexisNexis had less than six months remaining under contract.[78]  Glisky's analysis did not cover Add2Net's bandwidth SOF at issue in this case, though this information was provided to Zayo in the VDR.[79]

## E.  The Parties Negotiate Key Terms of the SPA

The day before Christmas Eve, 2014, Zayo sent Latisys a Letter of Intent ("LOI") proposing a base acquisition price of $655,000,000.[80]  This proposal was "based upon the key terms described below and in the separately included [SPA] mark-up," and was conditioned upon exclusivity moving forward.[81]

---

[77] JX 253.

[78] *Id.*

[79] *Id.*  PTO ¶ 18.

[80] PTO ¶ 16; JX 168.

[81] JX 168 at 1; JX 169.

Latisys never agreed to exclusivity and never signed Zayo's LOI.[82] Moreover, while Zayo repeatedly expressed to Latisys and DH Capital its desire to preempt the bidding process,[83] Zayo repeatedly rejected that overture as well.[84]

On the same day Zayo sent its LOI, Zayo sent its first redline of the SPA to Latisys.[85] Zayo changed one contract provision that is particularly relevant here: Section 4.12(b). Section 4.12(b), as originally proposed by Latisys, stated:

> Except as set forth on Schedule 4.12, as of the date hereof, since December 31, 2013, no Latisys Company has received any written notice of any default or breach by any Latisys Company under any Material Contract, except for defaults that have been cured or otherwise would not reasonably be expected to have a Material Adverse Effect.[86]

---

[82] PTO ¶ 17; Tr. 40 (Reardon). Zayo's LOI stated, "the parties agree to an exclusive negotiating period expiring at the close of business on Monday, January 19, 2015." JX 18. Reardon also raised the issue of exclusivity in a December 26, 2014 email, stating, "our expectation is that we reach agreement on value, key terms and exclusivity before diving into confirmatory due diligence details." JX 171. While pressing the issue with Latisys, Zayo knew that "exclusivity [was] going to be a very thorny issue." *Id.* An internal Zayo presentation in January 2015, after Latisys had proposed a price of $675 million, described the situation as follows: "Zayo made preemptive bid and indicated we would require 30-day exclusivity. DH has messaged that they will not shutdown process until SPA has been executed." JX 183. The "preemptive bid" in the LOI that Latisys never signed required 30 days of exclusivity. *Id.*

[83] PTO ¶ 14; *see* JX 157, 159, 168, 183, 191, 192. Internal presentations show Zayo considered $650 M (13.6 x EBITDA) to $675 M (14.1 x EBITDA) as the "[r]ecommended range," and believed "that [the] upper-end could preempt and shut down the process." JX 183 at 8.

[84] JX 183. Zayo decided on its own to accelerate its bidding process. *Id.*

[85] PTO ¶ 19; JX 169.

[86] JX 169 at 110.

17

Zayo changed the provision to read:

Except as set forth on Schedule 4.12, *all Material Contracts are valid, binding and enforceable in accordance with their terms against the Latisys Companies, as applicable*, and to the Knowledge of the Companies, each other party thereto, and are in full force and effect. No Latisys Company has received any written notice *that any party to Material Contract intends to cancel, terminate, materially modify, refuse to perform or **refuse to renew** such Material Contract or* of any default or breach by any Latisys Company under any Material Contract, except for defaults that have been cured or otherwise would not reasonably be expected to have a Material Adverse Effect.[87]

On December 30, 2014, Latisys responded to Zayo's proposed changes to the SPA. With respect to Section 4.12(b), Latisys accepted all of the proposed language except for Zayo's addition of the phrase "or refuse to renew."[88] Latisys struck that language from Zayo's return draft.[89] On January 8, 2015, Zayo returned the redline to Latisys—accepting Latisys' change to Section 4.12(b).[90]

The deal price was another key point of negotiation. Before Zayo delivered its LOI, DH Capital proposed a sales price of $680 million in a phone conversation with Zayo on December 19, 2014. In an email to Latisys and others reporting on the

---

[87] *Id.* (emphasis supplied).

[88] PTO ¶ 20; JX 180 at 106.

[89] *Id.*

[90] PTO ¶ 21. Because Zayo returned the redline with no changes or comments to Zayo's deletion of "refuse to renew," the parties assume, as do I, that Zayo accepted the change and there was a meeting of the minds that the phrase would not be included.

call, DH Capital stated, "we are giving [Zayo] a number that is enough to get the deal done, a realistic price that is only 6–7% above the mid-point of Zayo's range."[91]

For its part, Zayo undertook extensive financial modeling of the Latisys business.[92] It performed a synergies analysis and an analysis of implied multiples of publicly known comparable transactions.[93] The synergy analysis concluded that there would be significant cost savings through synergies.[94] The comparables analysis reflected "recent comparable transactions" at "13.6 X Avg Reported LQA EBITDA Mult."[95] In addition to his modeling of Latisys' customer contracts and revenue base, as discussed above, Glisky also performed a 30-year discounted cash flow analysis, a net present value sensitivity analysis and an internal rate of return analysis.[96]

---

[91] PTO ¶ 15; *see* JX 159 at 1.

[92] PTO ¶ 22; JX 253.

[93] PTO ¶ 22; JX 253.

[94] PTO ¶ 22; JX 253. Tr. 94–95 (Reardon); Tr. 260 (Glisky); JX 97 at 24.

[95] PTO ¶ 22; JX 253. JX 183 at 24.

[96] PTO ¶ 22; JX 253. Tr. 260–61 (Glisky); Tr. 63–64 (Reardon); Tr. 87 (Reardon); *see also* JX 75 at 5 (November 2014 presentation to Zayo's Board of Directors referencing a "30-Year DCF"); JX 97 at 2, 7 (November 2014 "Project Lincoln Overview and Bid Recommendation" summarizing a "5-Year IRR / NPV Sensitivity w/ Terminal Value").

By the time Zayo returned the draft SPA accepting Latisys' strike of the "refuse to renew" language, the price negotiations had ended and the parties were settled on $675 million.[97] Latisys was motivated to lower the price to $675 million in large part to avoid stagnation.[98] But $675 million was the floor.[99] DH Capital indicated to Zayo that Latisys was "highly price sensitive to the 675 M . . . not from a return perspective, but from being second guessed for shutting down at less than 12x their marketed ebitda number."[100]

Zayo and Latisys executed the SPA on January 13, 2015.[101] Zayo continued to engage in pre-Closing diligence,[102] and the transaction closed on February 23, 2015.[103]

---

[97] PTO ¶ 27; *see* JX 216.

[98] Tr. 461–62 (Hayes). ("Q. . . . Why was it that Latisys had agreed to lower its price from 680 to 675? A. I would say against my better judgment, I think the collective wisdom on sort of the folks who had input on our side, felt like it would move the deal along. So we were prepared to lower a little bit but no more.").

[99] *Id.*

[100] JX 192 at 1.

[101] PTO ¶ 29; *see* JX 213.

[102] PTO ¶ 32.

[103] PTO ¶ 33.

### F. The Relevant Provisions of the SPA

Zayo's claims implicate several provisions of the SPA. I discuss each briefly below.[104]

#### 1. Section 4.12(b)

Article IV of the SPA contains Latisys' representations and warranties. Of relevance here, Section 4.12(b) provides:

> Except as set forth on Schedule 4.12 . . . [n]o Latisys Company has received any written notice that any party to a Material Contract intends to cancel, terminate, materially modify or refuse to perform such Material Contract.[105]

Section 4.12 defines "Material Contracts":

> Schedule 4.12 lists the following Contracts to which a Latisys Company is a party or by which it is bound (collectively, the "Material Contracts") a true and complete copy of each of which has been made available to Purchaser.[106]

Schedule 4.12, in turn, lists the "Top 30 Customer Agreements," which are described as "Master Service Agreements and related Service Order Forms for each of the

---

[104] The SPA contains a clear and broad Delaware choice of law provision. JX 213 § 11.5 ("This agreement shall be governed by and construed in accordance with the laws of the State of Delaware. . . .").

[105] JX 213 at 31.

[106] JX 213 at 29.

21

[listed] Customers."[107]  Importantly, the SPA does *not* include any representations or warranties about Latisys' churn, churn rates, revenue or expected revenue.[108]

## 2. Section 10.1

Latisys agreed to indemnify Zayo and the post-close Latisys Companies as provided in Section 10.1.  Section 10.1(a) of the SPA states, in relevant part, that Latisys will indemnify Zayo and the L-Companies from and against "any and all" losses, damages and expenses incurred or paid "arising out of or resulting from a[] . . . breach of, default in, or failure to perform, any of the representations, warranties or covenants given or made by the [L-Companies] or [Latisys] in [the SPA]," (collectively "Company Breaches"), subject to a cap of $30,375,000 (per Section 10.1(c) of the SPA).[109]  Section 10.1(c) provides that Latisys would not be obligated to indemnify Zayo "unless and until the aggregate Damages . . . exceeds a cumulative aggregate amount of $3,375,000 (the "Basket")."[110]  And Section 10.1(c) makes clear that Zayo's "costs of investigation and attorneys' fees incurred in prosecuting the claim shall not count

---

[107] JX 214 at 74.

[108] JX 213.  Tr. 595 (Reardon).

[109] JX 213 at 60–61.

[110] *Id.*

22

towards achieving the Basket but shall count as Damages once such threshold has been achieved and the breach proven."[111]

## G. The Material Contracts

As noted, the SPA's Schedule 4.12 listed the Material Contracts that are subject to Section 4.12's Material Contracts representation and warranty. The five Material Contracts at issue in this litigation are described below.

### 1. Toshiba

Toshiba had two primary parent SOFs (the "Toshiba SOFs") with Latisys for services in Latisys' Irvine, California data center.[112] The Toshiba SOFs expired in November 2014, before the SPA was executed.[113] Only one of Toshiba SOFs had an "auto-renew" provision.[114]

On October 1, 2014, a Toshiba representative emailed Latisys Senior Sales Account Manager, Bill Rowcliffe, to advise him that Toshiba's SOFs had expired and to inquire whether Latisys would continue to provide services to Toshiba on a month-to-month basis until April or May 2015, when Toshiba would exit Latisys'

---

[111] *Id.*

[112] JX 481, 482.

[113] JX 481, 482.

[114] JX 481, 482.

data center and end the relationship.[115] As anticipated, on July 1, 2015 (after the Closing), Toshiba provided Rowcliffe, then a Zayo employee, thirty days' notice of its intent to exit the data center.[116]

But that was not the end of the Toshiba/Latisys relationship. In 2016, Toshiba approached Rowcliffe to explore whether Toshiba might return as a Zayo customer.[117] The parties ultimately struck a new deal as evidenced by Zayo's $293,659 invoice to Toshiba, reflecting services for January 2017 to September 2017.[118]

## 2. Add2Net

Add2Net had a bandwidth SOF with Latisys.[119] The Add2Net SOF had an original term of 24 months with an auto-renewal provision.[120] According to that provision, the contract would renew for one year at the end of the current term, unless either party provided written notice of non-renewal at least thirty days before the end

---

[115] PTO ¶ 49; JX 47.

[116] JX 381 at 1.

[117] JX 406, 407.

[118] JX 418.

[119] PTO ¶ 36.

[120] JX 480.

of the then-current contract term.[121] The original term of the bandwidth SOF expired in December 2013.[122] Add2Net then allowed its bandwidth SOF to renew automatically for another 12 months—extending the expiration date to December 2014. [123]

Before the expiration of the extended term, Add2Net emailed Rowcliffe to notify Latisys that Add2Net would "CANCEL" its bandwidth SOF "at the conclusion of the current contract" on November 25, 2014.[124] As a result, the Add2Net bandwidth SOF ended in December 2014 in accordance with its terms.[125]

On January 2, 2015, Add2Net emailed Latisys asking to "cancel the notice of cancellation" for Add2Net's bandwidth SOF and to continue bandwidth services on a month-to-month basis.[126] Latisys agreed and continued to invoice Add2Net for the bandwidth services month-to-month.[127] Because the "cancellation" had already

---

[121] *Id.*

[122] *Id.*

[123] *Id.*

[124] JX 118 at 2.

[125] JX 120. Latisys issued a "deprovisioning ticket" for the SOF, which noted that Add2Net should not be charged an early termination liability ("ETL") because it was churning at the end of the contract term. *Id.*

[126] JX 185.

[127] JX 356.

been processed, however, the cancellation was incorporated in the system that Latisys used for reporting and forecasting. Accordingly, the pending churn was automatically included in the EBITDA bridge that Latisys provided to Zayo during due diligence.[128] This information was also included in a pending churn report, identifying $14,850 in churn from the customer ADD2 (the code name for Add2Net) in Q1 2015.[129] Consequently, there was no expectation that this revenue would continue beyond a 30-month term.[130]

### 3. Echopass

EchoPass had two parent SOFs (the "EchoPass SOFs") with Latisys for services at Latisys' data centers in Ashburn, Virginia and Irvine, California.[131] Both SOFs were set to expire in May 2015.[132]

Beginning in late October 2014, and continuing through the drafting and execution of the SPA, EchoPass negotiated with Rowcliffe over the terms of two new SOFs and sought to obtain Latisys' agreement to a 20% price reduction in the

---

[128] JX 151; Tr. 310–13 (Butler).

[129] JX 486, 487; Tr. 281–82 (Butler).

[130] JX 486, 487; Tr. 281–82 (Butler).

[131] JX 483, 484.

[132] JX 483, 484.

new SOFs.[133]  After the Closing, Zayo approved the terms of the new Echopass SOFs and executed the SOFs.[134]  These new SOFs represented about $1.8 million in total contract value for Zayo.[135]

### 4.  ITC

ITC had a principal parent SOF (the "ITC SOF") with Latisys for services at Latisys' Oak Brook, Illinois data center.[136]  The ITC SOF expired in April 2014.[137] Beginning in September 2014, after the expiration of its old SOFs, Latisys Senior Account Manager, Gina Gardner, engaged in negotiations with ITC concerning the terms of a new SOF.[138]  During the course of these negotiations, ITC sought a price reduction in any new SOF.[139]  After Closing, Zayo approved and executed ITC's

---

[133] PTO ¶¶ 82–83; JX 67, 247.

[134] JX 430 at 24; JX 342.

[135] Tr. 320–21 (Butler).

[136] JX 472, 479.

[137] JX 472, 479.

[138] JX 38, 42; PTO ¶¶ 96–102.

[139] JX 92, 164, 268, 311, 320.

new SOF.[140]  This new SOF represented approximately $1.1 million in total contract value for Zayo.[141]

### 5. LexisNexis

LexisNexis had several SOFs[142] with Latisys for services at the Oak Brook, Illinois data center, the last of which (the "LexisNexis SOF") expired in April 2015.[143]  Beginning in early 2014, and continuing through the execution of the SPA, LexisNexis negotiated with Gardner over the terms of a new data center SOF.[144]  Not surprisingly, LexisNexis was looking for a price reduction.[145]  Zayo and LexisNexis reached an agreement on a new SOF after the Closing.[146]  Before the Closing, Latisys had offered LexisNexis a 6% price discount for a five-year term.[147]  After the

---

[140] JX 341.

[141] Tr. 330–31 (Butler).

[142] JX 473; JX 478; JX 474

[143] JX 474.

[144] PTO ¶¶ 66–74.

[145] *Id.*

[146] JX 325.

[147] Tr. 331 (Butler); PTO ¶ 74.

Closing, Zayo agreed to the same discount but for a shorter term.[148]  Even so, this new SOF represented approximately $1.1 million in total contract value for Zayo.[149]

## H. Procedural Posture

Zayo filed its Verified Complaint on November 4, 2016.[150]  The Complaint sets forth two counts.[151]  Count I seeks indemnification for damages caused by breaches of representations, warranties and covenants contained in the SPA.[152]  Count II seeks indemnification for continuing losses, including attorneys' fees.[153]  Zayo also seeks an order of specific performance directing Latisys to release funds held in an escrow account created per the SPA to cover such damages.[154]

The Court convened a three-day trial in November 2017.  Because Latisys' proposed damages expert, Jeff Litvak, had been placed on immediate medical leave just prior to trial with no expected return date,[155] the Court adjourned the trial

---

[148] PTO ¶ 74; JX 324 at 12.

[149] Tr. 330–31 (Butler).

[150] Compl.

[151] *Id.*

[152] Compl. ¶¶ 51–59.

[153] Compl. ¶¶ 60–64.

[154] Compl. ¶ 7.

[155] Dkt. 112.

following the presentation of fact witnesses to allow Latisys to engage a new damages expert.[156] The trial resumed on May 16, 2018, when the Court heard testimony from Zayo's expert, Kyle Anne Midkiff, and Latisys' new expert, Gary Kleinrichert.[157] The parties presented post-trial oral argument on September 5, 2018.

After presiding over the trial, considering the post-trial briefs and closing arguments and deliberating the evidence, I am struck by the absence of any serious factual disputes. There are some factual disagreements, to be sure, but the real controversy arises from the parties' disagreement about what the SPA actually says and what it means. Zayo's position boils down to this: Latisys was contractually obligated to disclose that the five customers who were counter-parties to the Material Contracts at issue here had notified Latisys of their intent not to renew the contracts or to renew on different terms. According to Zayo, non-renewal is tantamount to "termination" or "cancellation" as contemplated by Section 4.12(b). Latisys acknowledges that it did not advise Zayo of the non-renewals but maintains that it had no obligation to do so under Section 4.12(b) or otherwise.

This is the Court's post-trial decision.

---

[156] Tr. 1–605.

[157] Tr. 606–803.

## II. ANALYSIS

To prevail on a breach of contract claim, the plaintiff must prove: (1) the existence of a contract; (2) the breach of an obligation imposed by the contract; and (3) damages suffered because of the breach.[158] The first element is undisputed. The SPA is the operative contract. The case was tried on the issues of breach and damages. On these issues, Zayo was charged with meeting its burden of proof by a preponderance of the evidence.[159] In deliberating whether Zayo met its burden, I consider the questions in order: (1) did Zayo prove that Latisys breached the SPA; and (2) if so, did Zayo prove that it is entitled to damages?

### A. Latisys Did Not Breach the SPA

The Court's first function is to construe the relevant terms of the operative contract as a matter of law.[160] In doing so, the Court must be mindful that, under

---

[158] *See Bakerman v. Sidney Frank Importing Co.*, 2006 WL 3927242, at *19 (Del. Ch. Oct. 10, 2006).

[159] "Proof by a preponderance of the evidence means proof that something is more likely than not. It means that certain evidence, when compared to the evidence opposed to it, has the more convincing force and makes you believe that something is more likely true than not." *Del. Express Shuttle, Inc. v. Older*, 2002 WL 31458243, at *17 (Del. Ch. Oct. 23, 2002) (internal quotation marks omitted) (quoting DEL. P.J.I. CIV. § 4.1 (2000)).

[160] *O'Brien v. Progressive Northern Ins. Co.*, 785 A.2d 281, 286 (Del. 2001) ("Under Delaware law, the interpretation of contractual language . . . is a question of law.").

Delaware law, a "contract's express terms provide the starting point in approaching a contract dispute."[161]

## 1. Section 4.12(b) of the SPA Is Ambiguous

Section 4.12(b) of the SPA provides, in relevant part: "[n]o Latisys Company has received any written notice that any party to a Material Contract intends to *cancel, terminate, materially modify or refuse to perform* such Material Contract."[162] Zayo maintains the evidence reveals that Latisys did, in fact, receive "written notice" of (but did not disclose) (1) "an intent to *cancel* or *terminate* two Material Contracts (Add2Net and Toshiba); and (2) an intent to *materially modify* three Material Contracts (EchoPass, ITC and LexisNexis) by reducing the rates charged to those customers."[163]

Even at first glance, Section 4.12(b) is hardly a model of clarity. By reeling off the terms "cancel," "terminate" and "refuse to perform" in succession within the

---

[161] *Ostroff v. Quality Servs. Labs., Inc.*, 2007 WL 121404, at *11 (Del. Ch. Jan. 5, 2007). *See also Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del. 2006) (discussing the court's "four corners" analysis); *City Investing Co.*, 624 A.2d at 1198 (same); *Eagle Indus., Inc. v. DeVilbliss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997) ("[i]f a contract is unambiguous, extrinsic evidence may not be used to interpret the intent of the parties, to vary the terms of the contract or to create an ambiguity."); *City Investing Co. Liquidating Trust v. Cont'l Cas. Co.*, 624 A.2d 1191, 1198 (Del. 1993) ("If a writing is plain and clear on its face, *i.e.,* its language conveys an unmistakable meaning, the writing itself is the sole source for gaining an understanding of intent.").

[162] JX 213 at 31 (emphasis supplied).

[163] Pl.'s Opening Post-Tr. Br. 29 (emphasis supplied).

same clause, the parties appear to be saying the same thing with different words.[164] With this apparent redundancy in mind, I turn, as our courts often do, to the standard dictionary definitions of the terms under construction in search of some meaningful differentiation.[165] Unfortunately, but not surprisingly, the exercise has yielded little in the way of clarity. Black's Law Dictionary defines "cancel" as "to terminate a promise, obligation, or right."[166] The definition of "terminate" is "[t]o put an end to; to bring to an end."[167] In expanding on its definition of "cancellation," Black's states, "[t]he effect of cancellation is generally the same as that of termination, except that the canceling party retains remedies for breach of the whole contract or any unperformed balance."[168] Suffice it to say, the instinctive reaction to Section 4.12(b) is confirmed; there is considerable overlap between "cancel" and "terminate."

---

[164] Indeed, at trial and in its briefs, Zayo interchangeably used "terminate" and "cancel" to refer to their claims—*e.g.*, Pl.'s Reply Post-Tr. Br. 29 ("intention to cancel or terminate"); Tr. 590 (Reardon) ("cancellation or termination by the customer").

[165] *See Lorillard Tobacco Co.*, 903 A.2d at 738 (noting the frequency with which Delaware courts turn to dictionaries to assist in the construction of contractual terms); *Norton v. K-Sea Transp. P'rs L.P.*, 67 A.3d 354, 360 (Del. 2013) ("We give words their plain meaning unless it appears that the parties intended a special meaning.").

[166] *Cancel*, BLACK'S LAW DICTIONARY (10th ed. 2014).

[167] *Terminate*, BLACK'S LAW DICTIONARY (10th ed. 2014).

[168] *Cancellation*, BLACK'S LAW DICTIONARY (10th ed. 2014).

"Contractual interpretation operates under the assumption that the parties never include superfluous verbiage in their agreement, and that each word should be given meaning and effect by the court."[169]  This canon of construction, important as it is, cannot be honored when the scriveners leave no room to distinguish between the words they use to memorialize the clients' agreement.  Here, the relevant terms in Section 4.12(b) appear to be redundant.  The parties seize on the redundancy and proffer different constructions.  This, of course, does not mean the contract is ambiguous.[170]  If both proffered constructions appear reasonable, however, then the Court is free to consider extrinsic evidence to discern the intent of the parties.[171]

One reasonable construction of the apparently redundant terms is that "terminate"/"cancel"/"refuse to perform" capture the scenario where a customer expresses an intent not to renew its SOFs, and that "materially modify" includes negotiations for new terms in new contracts.  On the other hand,

---

[169] *NAMA Hldgs., LLC v. World Mkt. Ctr. Venture, LLC*, 948 A.2d 411, 419 (Del. Ch. 2007), *aff'd*, 945 A.2d 594 (Del. 2008); *see also Majkowski v. Am. Imaging Mgmt. Serv.*, 913 A.2d 572, 588 (Del. Ch. 2006) (stating, as a general matter, that courts "attempt to interpret each word or phrase in a contract to have an independent meaning so as to avoid rendering contractual language mere surplusage.").

[170] *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992) ("[a] contract is not rendered ambiguous simply because the parties do not agree upon its proper construction.  Rather, a contract is ambiguous only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings.").

[171] *Eagle Indus., Inc.*, 702 A.2d at 1232.

"terminate"/"cancel"/"refuse to perform" reasonably could contemplate notice only when a customer ends, or expresses an intent to end, a contract before the expiration of the contract's current, non-renewed term, and "materially modify" would apply only to modifications of an existing contract as opposed to a potentially renewed contract.

With two reasonable constructions in hand, I am satisfied Section 4.12(b) is ambiguous under the objective theory of contracts.[172]    Accordingly, I am now obliged to "look beyond the language of the contract to ascertain the parties' intentions."[173]    In doing so, I am mindful that I must respect, "to the extent possible, the reasonable shared expectations of the parties at the time they contracted."[174]

### 2.  Extrinsic Evidence Informs the Meaning of Section 4.12

When searching for the proper construction of ambiguous contractual terms, the court frequently refers to "evidence of prior agreements and communications of

---

[172] *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1160 (Del. 2010) ("The determination of ambiguity lies within the sole province of the court.").

[173] *Id.  See also BAE Sys. N. Am. Inc. v. Lockheed Martin Corp.*, 2004 WL 1739522, at *4 (Del. Ch. Aug. 3, 2004) ("[T]he Court will . . . consider extrinsic evidence to discern the 'reasonable shared expectations of the parties at the time of contracting.'") (quoting *Comrie v. Enterasys Networks, Inc.*, 837 A.2d 1, 13 (Del. Ch. 2003)).

[174] *Comrie*, 837 A.2d at 13 (quoting *U.S. West, Inc. v. Time Warner, Inc.*, 1996 WL 307445, at *9 (Del. Ch. June 6, 1996) (citation omitted)).

the parties as well as trade usage or course of dealing."[175] Our courts also appreciate that, "[i]n giving effect to the parties' intentions, it is generally accepted that the parties' conduct [in performance of the contract] before any controversy has arisen [should be] given 'great weight.'"[176] And finally, the drafting history of particular disputed provision(s) is often especially revealing of the process by which the parties reached a meeting of the minds and the ground on which that meeting occurred.[177]

The SPA drafting history makes clear that Latisys made no commitment to inform Zayo if existing customers will *or* will not renew their expiring contract. To the contrary, Latisys expressly declined to make that commitment when Zayo proposed it during the course of negotiations. Zayo did not object and the parties

---

[175] *Eagles Indus., Inc.*, 702 A.2d at 1233.

[176] *Ostroff*, 2007 WL 121404, at *11; *see also Radio Corp. of Am. v. Phila. Storage Battery Co.*, 6 A.2d 329, 340 (Del. 1939) ("It is a familiar rule that when a contract is ambiguous, a construction given to it by the acts and conduct of the parties with knowledge of its terms, before any controversy has arisen as to its meaning, is entitled to great weight, and will, when reasonable, be adopted and enforced by the courts. The reason underlying the rule is that it is the duty of the court to give effect to the intention of the parties where it is not wholly at variance with the correct legal interpretation of the terms of the contract, and a practical construction placed by the parties upon the instrument is the best evidence of their intention.").

[177] *See Eagle Indus., Inc.*, 702 A.2d at 1233; *see also Brace Indus. Contr., Inc. v. Peterson Enters.*, 2016 WL 6426398, at *9 (Del. Ch. Oct. 31, 2016) (considering drafting history); *Brace Indus. Contr.*, 2016 WL 6426398, at *9 (finding that drafting history was dispositive); *DCV Hldgs., Inc. v. ConAgra, Inc.*, 2005 WL 698133, at *10 (Del. Super. Ct. Mar. 24, 2005) ("Evidence of what was deleted from the original draft sheds light on the intended meaning of" the language agreed to in the final provision), *aff'd*, 889 A.2d 954 (Del. 2005).

executed the SPA without the "refuse to renew" language in the Material Contracts representation and warranty.[178] The fact that Zayo inserted this added language in its proposed SPA reveals that Zayo, like Latisys, believed that "refuse to renew" had a different meaning than the language already included in Section 4.12(b)—i.e., "terminate," "cancel" and "refuse to perform."

In addition to the drafting history, the testimony presented at trial confirms the parties' understanding that Latisys would not represent, and was not representing, whether customers had "refused to renew" Material Contracts. Hayes testified the phrase "refuse to renew" indicates a specific allocation of risk between the buyer and seller that would make the seller liable to the buyer for undisclosed upcoming churn.[179] Latisys very deliberately declined to agree to this language because it would never agree to a representation that would require it to isolate and disclose potential non-renewals.[180] Hayes explained:

> What we would not provide them notice of was if we had received any written notice from a client who would be refusing to renew. So in the case of a client [wh]o had expired, had been month to month, or was soon to expire and they made some indications about what their

[178] PTO ¶ 20; JX 180 at 106; Tr. 106 (Reardon).

[179] Tr. 449 (Hayes).

[180] Tr. 449:18–450:12 (Hayes).

37

intentions were, we pushed back and said we didn't think it was reasonable for us to have to provide a representation on that issue.[181]

The parties were purposeful in their negotiation of the Material Contracts representation and warranty. They chose not to include an obligation to disclose a customer's election not to renew a Material Contract. They also chose not to include a seller's covenant to disclose when a customer entered into a new contract with different terms. There is no room for this Court to impose those obligations now.[182]

Viewing the drafting history in this light is entirely consistent with the broader scheme of the SPA, a relevant guidepost as the Court construes individual provisions.[183] Section 9.1 of the SPA, entitled "Termination of Agreement," states

---

[181] Tr. 450:5–12 (Hayes).

[182] *DCV Hldgs.*, 2005 WL 698133, at *10 (concluding the negotiation history revealed a "mutual understanding that in the context of [the disputed provision] the word 'liabilities' meant actual liability at the time of the sale, not any liability that could accrue in the future," and holding the extrinsic evidence demonstrated "the agreed-upon intention of the parties was that the sellers would not be liable for future liabilities."); *Brace Indus. Contr.*, 2016 WL 6426398, at *9 (upholding the defendants' narrow interpretation of the provision, reasoning that, based on the drafting history, "it would be difficult for me to conclude that the Plaintiffs were not aware" of the defendants' intent to limit the scope of the provision.).

[183] *BAE Sys. N. Am. Inc.*, 2004 WL 1739522, at *4 (quoting *Council of Dorset Condo. Apartments v. Gordon*, 801 A.2d 1, 7 (Del. 2002)) (the Court "must interpret contractual provisions in a way that gives effect to every term of the instrument, and that, if possible, reconciles all of the provisions of the instrument when read as a whole."); *Chi. Bridge & Iron Co. N.V. v. Westinghouse Elec. Co.*, 166 A.3d 912, 913 (Del. 2017) ("In giving sensible life to a real-world contract, courts must read the specific provisions of the contract in light of the entire contract.").

the conditions under which the SPA "may be terminated prior to the Closing."[184] Section 9.3 provides that, "[i]n the event that this Agreement is validly terminated in accordance with Section 9.1, then each of the parties shall be *relieved of their duties and obligations arising under this Agreement* after the date of such termination."[185] As used in these provisions, the parties intended "terminate" to mean that a party cancels the agreement before the obligations contemplated by the *current contract* are performed. There is no basis to believe they intended a different meaning for "terminate" in Section 4.12(b).

When viewing the SPA in the context of the drafting history, the parties' expressed intentions to allocate risk in a specific manner and their consistent use of key terms throughout the SPA, the following is the only reasonable construction of Section 4.12(b): the phrase "[n]o Latisys Company has received any written notice that any party to a Material Contract intends to cancel, terminate, materially modify or refuse to perform such Material Contract" means that none of Latisys' top thirty customers had provided Latisys with written notice that they intended to discontinue services pursuant to a Material Contract SOF before the end of the SOF term and

---

[184] JX 213.

[185] *Id.* (emphasis supplied).

before the SOF had been fully performed, nor did any customer intend materially to modify a current Material SOF.[186]

### 3. Latisys Did Not Breach Section 4.12(b)

Having now provided the construction of the SPA that is supported by the contract, extrinsic evidence and applicable canons of contract interpretation, I turn next to Zayo's allegations of breach. As discussed below, the proper construction of the contract quickly reveals the fallacy of each of Zayo's claims that Latisys is in breach of Section 4.12(b).

### a. Toshiba

The Toshiba SOF with the auto-renew provision had a one-month renewal term duration.[187] *If* this SOF's renewal term was fixed for two or more months, Toshiba's October 1, 2014 email to Rowcliffe (notifying Latisys of the expiration of the SOF and discussing a one-month renewal) would have constituted written notice to Latisys that Toshiba intended to "materially modify" that contract. The SOF (even with one-month renewal), however, was on track to expire *before* the SPA was to be executed. Accordingly, the contracting party's decision to avoid automatic

---

[186] I note that this is also consistent with the plain meaning of "renewal": "the re-creation of a legal relationship or the replacement of an old contract with a new contract." *Renewal*, BLACK'S LAW DICTIONARY (10th ed. 2014).

[187] JX 482.

renewal of the contract does not constitute a material modification, cancellation or termination of that contract.

The Toshiba SOF without the auto-renew provision expired by its terms in November 2014.[188] After the expiration of that SOF, Latisys undertook to provide the same services specified in the SOF on a month-to-month basis. For each month after November 2014, Latisys' continuation of services during each successive month constituted an implied promise to provide those services for the rest of that month (but no longer). Thus, as of January 13, 2015, there was a one-month service contract between Latisys and Toshiba—the term of which was from January 1, 2015 to (and including) January 31, 2015.

Toshiba's October 1, 2014 email[189] to Rowcliffe does not indicate that Toshiba intended to cancel, terminate, not perform or materially modify its SOFs—in fact, all of its obligations were already fully performed under the two SOFs.[190] Latisys' entry into the new renewal contract was not out of the Ordinary Course of Latisys' Business and would not trigger notice under Section 4.12(b).[191]

---

[188] JX 481.

[189] JX 47.

[190] JX 253.

[191] The SPA's definition of "Ordinary Course of Business" is "the ordinary and usual course of the Latisys Companies' business." JX 213. Latisys agreed in Section 7.2(b) that it would not enter into any contracts other than those in the "Ordinary Course of Business."

### b. Add2Net

Latisys' continued provision of bandwidth services after receiving Add2Net's January 2, 2015 email constituted a promise to provide those services on a month-to-month basis.[192] Add2Net's subsequent acceptance of Latisys' bandwidth services constituted a promise to pay for those services. Thus, Latisys and Add2Net entered into a new contract on or about January 2, 2015, the term of which was from that date to (and including) February 1, 2015. Consequently, Add2Net's November 24, 2014 email to Rowcliffe did not notify Latisys that Add2Net intended to cancel, terminate, not perform or materially modify its expired Material Contract because that contract was fully performed. Latisys' entry into the new contract was not out of the Ordinary Course of its Business. Accordingly, there was no breach of Section 4.12(b).

### c. EchoPass, ITC and LexisNexis

Latisys' entry into *new* SOFs with EchoPass and ITC does not constitute a "material modification" of the SOFs set to expire in May 2015 and March 2014, respectively. Neither the EchoPass SOFs set to expire in May 2015, nor the ITC SOF set to expire in April 2014, contained an "auto-renewal" provision. Once again, these contracts were fully performed and were not modified. It was in the Ordinary

---

[192] JX 356.

Course of Latisys' Business to negotiate prices with customers (and to agree to price reductions) in connection with *new* SOFs. Rowcliffe described these negotiations as "[t]otally ordinary" and "standard practice."[193] Moreover, the customer's election not to allow automatic renewal of its contracts did not constitute a "cancellation" or "termination" of those contracts—as in the case of LexisNexis. That Latisys did not disclose the status of renewal negotiations with LexisNexis, or efforts to secure a new contract (albeit on different terms), therefore, cannot constitute a breach of Section 4.12(b).

## B. Zayo Has Not Proven Damages

While the determination that Zayo failed to prove a breach of the SPA could, and perhaps should, end the inquiry, for the sake of completeness, I have also considered whether Zayo proved recoverable damages. It did not.

Even if Zayo had proven a breach of Section 4.12(b), it still was obliged to prove its damages by a preponderance of the evidence in order to recover. In this regard, Zayo had to be precise in articulating and proving what it was seeking. Contract damages are not like some works of abstract art; the plaintiff cannot simply throw its proof against the canvas and hope that something recognizable as damages

---

[193] JX 430 at 23.

emerges.[194] This was especially so in this case because Zayo's damages proof had to account for the indemnification scheme set forth in the SPA and, in particular, the damages Basket the parties agreed to in Section 10.1(b).[195]

Zayo's damages case rested on the opinions of its expert, Kyle Midkiff. While certainly qualified to calculate damages in the ordinary course, Midkiff's lack of experience in valuing going concern businesses proved a disadvantage to her and ultimately rendered her opinions in this case unpersuasive.[196] Midkiff opined that

[194] *See Duncan v. TheraTx, Inc.*, 775 A.2d 1019, 1022 (Del. 2001) (holding that the court may not award speculative damages in a breach of contract case); *Paul v. Deloitte & Touche, LLP*, 974 A.2d 140, 146 (Del. 2009) (noting that breach of contract damages are not to provide a "windfall" for the plaintiff and that plaintiffs seeking breach of contract damages must be precise in their proof).

[195] Only if Zayo's damages are in excess of the Basket—the cumulative aggregate amount of $3,375,000—is Latisys obligated to indemnify Zayo, and then only for damages in excess of the Basket. JX 213 ("The indemnification provided for in this Section 10.1 shall not apply unless and until the aggregate Damages so determined to be due for which one or more Purchaser Indemnified Persons seeks or has sought indemnification hereunder exceeds cumulative aggregate amount of $3,750,000 (the 'Basket')[.]")). *See PharmAthene, Inc. v. SIGA Techs., Inc.*, 2014 WL 3974167, at *7 (Del Ch. Aug. 8, 2014) ("In the same vein, the Supreme Court also emphasized the central role of the contract as the source of any remedy . . . .").

[196] Tr. 657:22–658:7 (Midkiff) (explaining that she had never valued a business); Tr. 726:16–726:19 (Kleinrichert) ("[T]o the extent the damage is derived by an alleged change in the value of what the deal should have been, then, of course, the valuation experience is pretty critical."). Latisys' expert, Gary Kleinrichert, on the other hand, has significant experience in benefit-of-the-bargain damages and business valuations. He is certified by the National Association of Certified Valuation Analysts as a valuation analyst. Tr. 724:1–23 (Kleinrichert). He has previously served as an expert in post-acquisition disputes involving representations and warranties made in a purchase and sale agreement, and has performed approximately one hundred business valuations. Tr. 725:19–23; 726:3–4 (Kleinrichert).

44

Zayo had suffered approximately $22 million in damages.[197] For reasons still unclear, Midkiff elected to base her opinion solely on a multiple of EBITDA as a means to reach Zayo's expectancy damages. As explained below, this methodology does not fit the facts here and results in a grossly inflated final damages number.

Benefit of the bargain—or expectancy—damages measure the difference between the as-represented value of a transaction (typically the purchase price) and the value the purchaser actually received.[198] The actual value the purchaser received, in turn, must assume, and account for, a diminution of the company's earnings into perpetuity.[199] The "benefit of bargain" methodology is appropriate for calculating damages only when the alleged breach of the representation or warranty has caused a permanent diminution in the value of the business (as a result of lost revenues into perpetuity) and the business has thereby been permanently impaired.[200] This is where Zayo's proof, and Midkiff's damages calculations, fell short.

While Midkiff acknowledged at her deposition that a multiple methodology in damages calculations fits only where monthly recurring revenue was lost "into the

---

[197] Tr. 632:15 (Midkiff).

[198] Tr. 726:16–727:4 (Kleinrichert).

[199] Tr. 736:23–737:10 (Kleinrichert).

[200] "Impairment" is an accounting term that means the value of a company has declined below its carrying cost. Tr. 737:14–16 (Kleinrichert).

foreseeable future,"[201] which she defined as "one year,"[202] at trial Midkiff admitted that all of the Material Contracts at issue in this case expired in less than one year.[203] For example, Midkiff conceded at trial that if Zayo knew the Toshiba Material Contracts were month-to-month at the time of the Closing, Zayo's damages relating to the Toshiba contract would be no more than one month's MRR.[204] In this regard, the credible evidence at trial revealed that when Zayo signed the SPA, Zayo knew that because Toshiba was a month-to-month customer, the maximum amount of revenue Toshiba was contractually obligated to pay to Latisys was thirty days of revenue.[205] For that reason alone, based on Midkiff's own trial testimony, her damages methodology does not apply to the Toshiba SOFs. And, for reasons explained below, it cannot apply to the other four customers' SOFs either.

Not only did Zayo make no effort to prove a diminution of value into perpetuity, Zayo did not perform a post-Closing valuation of the company it had

---

[201] JX 447 at 34.

[202] *Id.*

[203] Tr. 699:23–700:7 (Midkiff); *see also* Tr. 689:8–21 (Midkiff) (testifying that the foreseeable future means one year or more).

[204] Tr. 706:4–707:2 (Midkiff). In other words, the damages related to Toshiba would be $82,920, not $10,500,000, the number attributed to Toshiba in Midkiff's damages calculation.

[205] Tr. 596:20–597:20 (Reardon).

acquired.[206]  Whether tactical or not, I can appreciate why Zayo may have avoided

taking on the challenge of proving that Latisys was worth less ($22 million less to

be precise) after Closing.[207]  Latisys' cloud storage business was a revolving door;

---

[206] Tr. 665:9–14 (Midkiff) ("Q.  Let me state it this way. You have done no calculation one way or another about what the value of Latisys was as of the time of the closing; right? A. That's correct, I did not do a valuation.").  Indeed, what evidence Zayo did present on post-Closing valuation revealed that Zayo believed Latisys' value had actually *increased* post-Closing and that the acquisition was delivering positive returns on the investment. Tr. 739:8–12 (Kleinrichert) ("I looked to internal analysis of value that [Zayo] may have done at that time or subsequently later.  And those internal analyses indicated that [Zayo] believed the value of [Latisys'] business had increased.").  *See also* JX 410-0009 (June 2016 Zayo presentation titled "zColo Valuation Analysis:  Zayo + Latisys Platform" which reflects that Zayo thought the Latisys acquisition created additional value for Zayo's colocation business, stating it was "[c]onfident about zColo + Latisys as optimal platform for value creation.").

[207] Zayo also did not provide a basis for Midkiff's opinion that Zayo would not have paid $675 million for Latisys had Zayo known about the upcoming churn from the five contracts at issue.  Tr. 678:14–679:14 (Midkiff) ("Q.  I direct your attention to the testimony on the bottom of page 180 and the top of page 181.  In particular, when I asked you about the pricing and whether or not if Zayo had known about this information, you had any knowledge about whether the parties would or would not have done a deal at 675.  You said on page 181, in response to the questions on lines 4 and line 6, you answered both questions: 'True.'  A.  Right.  But the answer before that, I said, 'I don't know that it was specifically represented or stated, but it's my understanding that they would not have paid. If they'd known, they might have negotiated a different price.'  Q.  Okay.  No one ever told you that they wouldn't have paid that amount.  Correct?  A.  It's my understanding.  I don't know if it came up on some of the phone calls that I had with Zayo folks where they said no, they don't think they would have.  Q.  You are unable to tell the Court at this moment in time what your understanding is based on.  Correct?  A.  Yes.").  To be sure, no Zayo witness testified that Zayo would not have paid $675 million for Latisys had Zayo known the status of the Material Contracts at issue.  And no Zayo witness testified that Zayo viewed the Latisys assets as de-valued at or after the Closing.  Tr. 628:22–629:2; 665:9–14 (Midkiff).

it was built on short-term contracts with customer loyalty of four to five years.[208]

Customers were utilizing Latisys' services until they could store their data on their

own or find cheaper storage elsewhere. Indeed, Latisys knew it was buying a

business with short-term contracts.[209] The five Material Contracts at issue in this

case expired in less than one year from the time Zayo was looking at the Latisys

acquisition.[210] To the extent Zayo knew contracts were near expiration or month-to-

month as of Closing, there was no basis for Zayo to claim expectancy damages

beyond one month's MRR.[211]

Given this dynamic, it is difficult to understand why Midkiff would choose an

EBITDA multiple as the most accurate and comprehensive metric for valuing

damages. Indeed, there is no evidence that Zayo actually based its purchase price

on a multiple of EBITDA. Glisky used a DCF, an IRR and a NPV-sensitivity

---

[208] JX 62.

[209] Tr. 125:15–126:10 (Reardon). *See also* Tr. 596:16–19 (Reardon) ("[W]e understood that contractually those customers were not obligated to stay any more than 30 days after they gave notice to cancel or terminate.").

[210] Tr. 699:23–700:7 (Midkiff); *see also* Tr. 689:8–21 (Midkiff) (testifying that the foreseeable future means one year or more).

[211] Tr. 706:4–707:2 (Midkiff). *See also* Tr. 596:20–597:20 (Reardon) (acknowledging that Zayo knew that because Toshiba was a month-to-month customer, the maximum amount Toshiba was contractually obligated to pay to Latisys was thirty days of revenue).

analysis.[212]  Reardon confirmed that the purchase price was the result of a number

of different factors.[213]  Given this evidence, it is not surprising that Midkiff struggled

to explain how she selected 14.1 as the EBITDA multiple she should apply.  Her

explanation, "[i]t's the highest multiple. . . . [i]t seemed to be the appropriate multiple

based on the sale price,"[214] lacked any foundation in the evidence and ultimately was

unpersuasive.[215]

By contrast, Kleinrichert proffered three credible damages scenarios, each tied

to the evidence, proving that the realized damages would not exceed the Basket.  The

---

[212] Tr. 260:19–261:7 (Glisky).  ("Q.  Sir, was the purchase price ever based on a precise multiple?  A.  The exact purchase price?  Q.  Yes, sir.  A.  Sure, no.  Q.  It wasn't.  The purchase price was negotiated, and then Zayo implied the multiple from the negotiated purchase price; correct?  A. Final multiple, correct.") (Tr. 207:8–16 (Glisky)).

[213] Tr. 120:17–121:20 (Reardon).

[214] Tr. 685:3–22 (Midkiff).

[215] While Zayo string cites to cases where courts have relied upon an EBITDA multiple to calculate damages, it has not credibly argued how or why those cases dictate that result here.  *See* Pl.'s Post-Tr. Br. 44.  *See also Priority E.M.S. v. Crescent City E.M.S.*, 829 So. 2d 1066, 1068–70 (La. App. 4th Cir. 2002) (allegations of fraud and breach of contract in confection of a loan agreement); *see also Cobalt Operating, LLC v. James Crystal Enters.*, 2007 WL 2142926, at *80–83, *91–97 (Del. Ch. July 20, 2007), *aff'd*, 945 A.2d 594 (Del. 2008) (EBITDA multiple proper for calculating damages for breach of contract based on seller's fraudulent misrepresentation, which resulted in permanent impairment to business, and where it was undisputed that the parties relied on a multiple in calculating purchase price); *WaveDivision Hldgs., LLC v. Millennium Dig. Media Sys., L.L.C.*, 2010 WL 3706624, at *23–24 (Del. Ch. Sept. 17, 2010) (finding the use of an EBITDA multiple was appropriate to calculate damages where the seller breached a stock purchase agreement and failed to transfer ownership of its company to the buyer; the plaintiff did not receive the benefit of its bargain, and the question of whether damages should be calculated based on dollar-for-dollar, as opposed to an EBITDA multiple, was not addressed.).

first and most appropriate (and credible) measure, in my view, is an out-of-pocket costs analysis for the lost revenue through the remaining contract term of each of the Material Contracts at issue. This calculation assumes Zayo (and each of the five customers) would re-negotiate contracts at the end of the contract term consistent with the market.[216] The total damages, approximately $2.1 million, is less than the $3.375 million Basket.[217]

In his second scenario, Kleinrichert looked at the record and calculated damages for a period *longer* than the remaining contract term for each of the SOFs at issue in this case.[218] The total damages under this scenario are $3,439,948 (slightly above the Basket).[219] Of course, Zayo and each of the five customers know the market and that knowledge would have informed their negotiations of any

---

[216] Tr. 751:13–752:3; 764:20–765:8 (Kleinrichert).

[217] SPA § 10.1(c); JX213 at 60–61.

[218] Tr. 755:21–24 (Kleinrichert).

[219] Tr. 758:22–759:6 (Kleinrichert). As noted, under the second scenario, Kleinrichert calculated damages for a period longer than the remaining contract term for each of the SOFs at issue in this case. Tr. 755:21–756:24 (Kleinrichert). In his trial testimony, Kleinrichert re-examined his premise that Zayo and Echopass, IT Convergence, and LexisNexis would not exercise the optional renewal periods in their respective post-Closing SOFs with Zayo. Tr. 758:10–13 (Kleinrichert). Kleinrichert added to his first damages calculation additional lost MRR for the optional renewal periods included in the new Echopass, IT Convergence and LexisNexis SOFs. Tr. 758:13–15 (Kleinrichert). Discounted to the date of the Closing, as in the first scenario, this added approximately $1.3 million to the damages calculation, bringing the total damages above the Basket by approximately $65,000. Tr. 758:22–759:6 (Kleinrichert).

contract extensions.[220] Given the market reality, and the need to offer (sometimes significant) price concessions to keep customers, a damages calculation that assumes Zayo would have realized revenue beyond the bargained-for SOF does not comport with the evidence of record.[221]

Kleinrichert's third damages scenario totaled the alleged lost MRR for each of the five customers, removed the lost Add2Net MRR because Zayo received the benefit of that contract, subtracted from the total lost MRR the Toshiba MRR that returned to Zayo in 2017, and annualized the total.[222] Under this scenario, the damages were $3,129,353 (below the Basket).[223]

As its rebuttal to the Kleinrichert analysis, and its final push for benefit of the bargain damages, Zayo argues that a "permanent impairment" occurs whenever "the

---

[220] Tr. 744:14–745:8 (Kleinrichert).

[221] *See, e.g.*, Tr. 248:10–249:16 (Butler); Tr. 496:10–22; 494:7–11 (Stevenson) ("So your really important customers who had large MRR, which might be defined as [$10,000] or $15,000 a month or higher, they're sophisticated buyers, so you would end up in that case talking to the customer about a renewal. . . . I would take a—let's just say a customer who was billing a thousand dollars a month, and they said, 'I want it for 950, but I'll sign a new 24- or 36-month contract.' I would take that all day long, because if I didn't, it might be zero. And zero is not good because zero would have to go and fill up again. So we always focused in on making sure that we never got to zero. Now, of course, there's deals you would look at if the customer came to you and said, 'I want this stuff below a level that's acceptable,' then sometimes you have to walk away from a deal like that if you can't make money.").

[222] Tr. 760:13–761:5 (Kleinrichert).

[223] Tr. 761:21–23 (Kleinrichert).

buyer's expectation of the transaction has been materially affected."[224] Zayo contends that because each of the contracts at issue in this case are Material Contracts under the SPA, the misrepresentations allegedly at issue in this case are by design material, and calculating damages using a multiple is automatically appropriate.[225] This argument is not supported by Midkiff's testimony, nor by the factual record, and is inconsistent with the AICPA Practice Aid. As Kleinrichert testified, and as the AICPA Practice Aid confirms,[226] using a multiple to calculate damages is appropriate only where there is a permanent impairment to the value of the business and the value the buyer receives is less than the value for which the buyer bargained.[227] Contrary to Zayo's characterization, the AICPA Practice Aid does not provide that where a buyer's subjective expectation has been materially

---

[224] Pl.'s Post-Tr. Br. at 44.

[225] Pl.'s Post-Tr. Br. at 45 ("The [American Institute of Certified Public Accountants Mergers and Acquisitions Disputes Practice Aid ('AICPA Practice Aid')] also provides that if materiality is defined within the acquisition agreement, 'the practitioner should adopt the agreement's definition of materiality when evaluating the transaction.' [(JX 466 at 19).] Here all five contracts in dispute have been defined as material within the SPA, and hence the misrepresentation was also material.").

[226] JX 466 at 19 ("Indemnity claims can result in damages measured at the multiple. This measurement implies the occurrence of permanent impairment to the value of the business.").

[227] JX 466.

affected, a multiple methodology is appropriate.[228] Simply stated, the result suggested by Zayo—that because the alleged breaches involved Material Contracts, a multiples methodology for calculating damages must follow—is not supported by the competent evidence and not supported by the fundamental premise of compensatory damages for breach of contract.[229]

After carefully considering the evidence, I am satisfied that even assuming *arguendo* that Zayo had met its burden to prove a breach of Section 4.12(b), the only credible basis in the evidence to calculate damages resulting from that breach reveals that Zayo has not suffered damages in excess of the Basket. Consequently, Latisys is not obligated to indemnify Zayo in any amount.

## III. CONCLUSION

Because I find that Latisys did not represent and warrant in Section 4.12(b) that it would inform Zayo if customers elected not to renew Material Contracts, or bargained for different terms in new contracts with existing customers, I am satisfied that Zayo has not proven a breach of contract. Even if Zayo had proven a breach, it

---

[228] The AICPA Practice Guide, instead, states that *when* there has been a "permanent impairment to the value of the business," *then* "the buyer's expectation of the transaction has been materially affected" and a multiple is appropriate. JX 466 at 17.

[229] *See Paul v. Deloitte & Touche, LLP*, 974 A.2d 140, 146 (Del. 2009) (observing, "contract damages are designed to place the injured party . . . in the same place he would have been had the contract been performed" and that such damages "should not act as a windfall.").

has not proven recoverable damages. My verdict, therefore, is for the Defendant. The parties shall confer and submit an implementing order and final judgment within ten (10) days.